**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ANNE HARDING,** | § | |
| **RAY HUEBNER,** | § | |
| **GREGORY R. JACOBS,** | § | |
| **MORGAN MCCOMB, AND** | § | |
| **JOHANNES PETER SCHROER,** | § | |
| | § | |
| **PLAINTIFFS,** | § | |
| | § | |
| **v.** | § | **CASE NO. _____** |
| | § | |
| **COUNTY OF DALLAS, TEXAS,** | § | |
| **CLAY LEWIS JENKINS, in his official** | § | |
| **capacity as County Judge of Dallas** | § | |
| **County, Texas;** *et al.*, | § | |
| | § | |
| **DEFENDANTS.** | § | |

## ORIGINAL COMPLAINT

Like something out of the bad old days, a southern electoral body plays naked racial politics, intentionally using its power to minimize a dissenting race's political sway. The body does so through its redistricting authority, cramming as much of that racial minority as possible into a single district and splitting the remainder up as an insignificant fraction of the electorate in the surrounding districts. It undertakes this move to intentionally deny the racial minority a chance to fairly participate in the electoral process, while claiming that the minority has no legal right to protection and arguing that higher law compels the racist act.

That's not history -- it's today's Dallas County. Dallas County became a majority-minority jurisdiction before the turn of the century, finally losing its non-Hispanic White ("Anglo") plurality in 2006. A change-over in control of the Dallas Commissioners Court (the "Commissioners Court"), from one ethnically-

based, bloc-voting majority coalition to another, followed that same year.  As a result, since 2004, the candidate preferred by the Anglo racial minority has almost never won countywide general elections contested by the major parties.

So a new majority remapped Dallas's districts after the 2010 census. The new majority of the Dallas Commissioners Court used that chance to draw Commissioners Court districts that violate the rights of Dallas's Anglo minority, denying it rights protected by the United States Constitution and the Voting Rights Act.

To right this wrong, the plaintiffs ask the Court to: (i) declare the resulting map invalid; and (ii) either: (a) compel Dallas to draw a map consistent with American law by a date certain; or (b) draw one for Dallas, should the Commissioners Court fail to timely do so.

## I.      PARTIES

1.      Anne Harding is an Anglo resident of Dallas County, Texas ("Dallas").  Ms. Harding resides in current Commissioners Court District ("CCD") 4.

2.      Ray Huebner is an Anglo resident of Dallas.  Mr. Huebner resides in CCD 1.

3.      Gregory R. Jacobs is an Anglo resident of Dallas.  Mr. Jacobs resides in current CCD 1.

4.      Johannes Peter Schroer is an Anglo resident of Dallas.  Mr. Schroer resides in current CCD 3.

5.      Morgan McComb (along with Mr. Harding, Mr. Huebner, Mr. Jacobs, and Mr. Schroer, the "Plaintiffs") is an Anglo resident of Dallas.  Ms. McComb resides in current CCD 2.

6.      Dallas is a political subdivision of the State of Texas, under Article I, Section 1 of the Texas Constitution.  First formed by the Republic of Texas in 1846, Dallas is governed by the Commissioners Court, a five (5) member body composed of a County Judge elected by Dallas's electorate at large and four (4) County Commissioners representing districts drawn by the Commissioners Court. Dallas may be served with process through County Judge Clay Lewis Jenkins.

7.      Clay Lewis Jenkins is sued solely in his official capacity as the County Judge of Dallas.

8.      Commissioners Theresa Daniel, Mike Cantrell, John Wiley Price, and Elba Garcia are sued solely in their official capacities as County Commissioners.

## II.      JURISDICTION AND VENUE

9.      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1357.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## III.      FACTS

11.      The Dallas electorate votes in cohesive, polarized racial blocs. African Americans and Anglos are each politically cohesive.  As a group, Dallas's African Americans prefer candidates running as Democrats in general elections. As a group, Dallas's Anglos prefer candidates running as Republicans in general elections.

12.      The Dallas electorate's voting patterns also diverge between "language minorities" and Anglos.  If taken as a single group, Dallas's Hispanics prefer candidates running as Democrats in general elections.  Dallas's Anglos, again, do not.

13.     According to the 2010 census, Anglos are a minority in Dallas, constituting 48% of Dallas's citizens of voting age.

14.     Since 2004, Dallas's non-Anglo majority has voted sufficiently as a bloc to consistently deny Dallas's Anglo minority the chance to elect its candidates of choice.   In 2006, the Anglo minority was able to produce narrow county-wide majorities for its preferred candidates in some top-of-the-ticket, statewide races (including those electing a United States Senator, Texas's Lieutenant Governor, Texas's Comptroller, and Texas's Attorney General), but failed to do so in the races electing the Governor or lower statewide officers (like the Land Commissioner and the Agriculture Commissioner), or in any race for county government office.   More recently, only two candidates preferred by Dallas's Anglos have narrowly won the county in any election contested between the major parties over the last four (4) cycles.   The consistent pattern shows that in gubernatorial election years (2006, 2010, and 2014), countywide races see an ethnically defined majority reject candidates preferred by Dallas's Anglo minority, often by narrow margins; in Presidential election years (2008 and 2012), the same ethnically defined majority does the same, with larger margins.

15.     Dallas and its subdivisions have an established history of voting-related discrimination.  Dallas has seen consistent, overt and subtle racial appeals in its local elections held after 2004, including in elections to the Commissioners Court.   The Commissioners Court over that period has demonstrated unresponsiveness to its Anglo minority.

16.     The Commissioners Court crafted its current map (the "Discriminating Map") following the 2010 census and approved that Discriminating Map on a 3-1 vote at a hearing held on June 7, 2011 (the final member of the Commissioner's Court did not vote, as she had walked out of the hearing in protest over the Discriminating Map).

17.     At that June 7, 2011 hearing, Commissioner Price, the Discriminating Map's sponsor, disclosed that the Commissioners Court had considered but rejected an "impulse" to "fragment the Republican areas of the county to draw all four commissioner districts as Democratic districts."  He omitted, except by implication, that instead they had decided to intentionally crack and pack Dallas's Anglo minority through the Discriminating Map to provide Anglos a less obviously offensive, but still-less-than-equal opportunity to participate in the political process and to elect their Commissioners of choice.

18.     Commissioner Price explained that the Discriminating Map had been crafted to "acknowledge[] the dramatic growth involving, you know, of Hispanic and African American population[s] and our obligation under the U.S. Voting Rights Act to provide [those] voters with an effective opportunity to elect their preferred candidate of choice."  He made no reference to the opportunities the Discriminating Map afforded the dissenting Anglo racial minority, though, nor the impact of the Voting Rights Act on the Commissioners Court's ability to fragment its vote.  He went on to describe CCD 4 as having been designed to elect a "candidate of choice of Hispanic voters" and CCD 3 as having been drawn to "continue to provide African American voters an effective opportunity to elect" a commissioner of their choice, despite the fact that both Hispanic voters and African American voters were represented by members of the Commissioners Court majority crafting the map.  Judge Jenkins filled in the final blank, explaining that the newly created CCD 1 had been crafted (in a bizarre misstatement of the Voting Rights Act's requirements) as a "Democratic Opportunity District," justified by the rise of Dallas's Hispanic and African American populations and intended to allow the newly governing, bloc-voting, majority ethnic coalition the "opportunity to elect their candidate of choice in [the 2012] election."

19.     So the majority of the Commissioners Court simultaneously passed a map designed to punish its racial enemies, while patting itself on the back for its adherence to the Voting Rights Act.  By all appearances, they simply concluded that the Voting Rights Act: (i) offers an Anglo minority no protection against the intentional dilution of its votes; and (ii) *requires* that a governing majority coalition made up of other bloc-voting ethnic groups carve itself more pie.

20.     To express numerically how the Commissioners Court followed through on that apparent decision, the Discriminating Map "packed" CCD 2 with 43% of Dallas's Anglos, creating a super-concentration of Anglos in that district. As a result, Anglos constitute more than 72% of CCD 2's citizens of voting age. Simultaneously, the Discriminating Map divides the remaining Anglo population among CCD 1 (assigned 22% of Dallas's Anglos, 45% of CCD 1's CVAP), CCD 3 (assigned 18% of Dallas's Anglos, 32% of CCD 3's CVAP), and CCD 4 (assigned 18% of Dallas's Anglos, 39% of CCD 4's CVAP) so assuring the political insignificance of the Anglo voters isolated in each.

21.     The Commissioners Court chose to entrench racial divisions along partisan lines for the next decade.  It chose to dilute the overall influence of the Anglo minority in Dallas so that, even if cross-over voting allowed an Anglo-preferred candidate to win the County Judgeship, Anglos could not obtain control of the Commissioners Court.  It did so, even though it meant dividing political subdivisions, and exaggerating the population disparities between CCDs (whether measured by total population or by CVAP) far beyond the ideal distribution.

22.     The Commissioners Court could have acted differently.   The Anglo minority is a sufficiently compact, sufficiently large portion of Dallas's citizen voting age population, which turns out to vote in sufficient numbers, that the Commissioners could have drawn a second performing Anglo CCD.  Indeed, had had it drawn a map that better respected Dallas's political subdivisions and

more fairly apportioned Dallas's citizens and residents among the districts, it would have produced such a map.

23.     Instead, the Commissioners Court chose to punish Dallas's dissenting race.

## IV.     CLAIMS FOR RELIEF

### A.  VRA SECTION 2

24.     The Plaintiffs restate and incorporate by reference all allegations made in paragraphs 1-23, above.

25.     The facts alleged demonstrate the imposition of standards, practices, or procedures that result in a denial or abridgement of the Plaintiffs' right to vote for their Commissioners, in violation of Section 2 of the Voting Rights Act.  42 U.S.C. § 1973.

### B.  EQUAL PROTECTION

26.     The Plaintiffs restate and incorporate by reference all allegations made in paragraphs 1-23, above.

27.     The facts alleged constitute a denial to the Plaintiffs of rights guaranteed by the Equal Protection Clause of Section 1 of the 14th Amendment to the United States Constitution.

### C.  CONSTITUTIONAL RIGHT TO VOTE

28.     The Plaintiffs restate and incorporate by reference all allegations made in paragraphs 1-23, above.

29.     The facts alleged constitute a deprivation of the Plaintiffs' right to vote, as protected by the 15th Amendment to the Unites States Constitution.

### D.  ALTERNATIVE EQUAL PROTECTION CLAIM

30.     The Plaintiffs restate and incorporate by reference all allegations made in paragraphs 1-23, above.

31.     To the extent that the Court determines that Dallas's Anglo minority isn't a protected class under Section 2 of the Voting Rights Act, regardless of facts on the ground, the Voting Rights Act denies Dallas's Anglo minority the equal protection of the law guaranteed by the 14th Amendment to the United States Constitution.

### E.  ATTORNEYS' FEES

32.     The Plaintiffs restate and incorporate by reference all allegations made in paragraphs 1-31, above.

33.     To the extent that the Plaintiffs prevail on any of the theories set out above, they are entitled to recover their reasonable attorneys' fees from Dallas.

## VI.     PRAYER

Therefore, the Plaintiffs ask the Court to:

(a) Enter declaratory judgment that the Discriminating Map violates the Plaintiffs' rights under the United States Constitution, the Voting Rights Act, or both;

(b) Grant appropriate injunctive relief enjoining the Defendants, their officers, agents, employees, attorneys, successors in office, and all persons in active concert or participation with them, from implementing the Discriminating Map in primary or general elections to be held in 2016, until and unless the legal violations found in the Discriminating Map are remedied by the Commissioners Court by a date certain or by this Court;

(c) Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order a valid Commissioners Court map for use in the 2016 elections;

    (d) Grant the Plaintiffs' their reasonable attorneys' fees, litigation

          expenses, and costs in maintaining this action; and

    (e) Grant the Plaintiffs such further relief as is just and proper.

Respectfully submitted,

The Equal Voting Rights Institute
P.O. Box 12207
Dallas, Texas 75225
danmorenoff@equalvotingrights.org
www.equalvotingrights.org


_____ */s/ Daniel I. Morenoff* _____
Daniel I. Morenoff
Texas Bar No. 24032760
The Morenoff Firm, PLLC
P.O. Box 12347
Dallas, Texas 75225
Telephone: (214) 504-1835
Fax: (214) 504-2633
dan.morenoff@morenoff-firm.com
www.morenoff-firm.com

COUNSEL TO THE PLAINTIFFS