IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ANNE HARDING, et al.,                    §
                                         §
                        Plaintiffs,      §
                                         §  Civil Action No. 3:15-CV-0131-D
VS.                                      §
                                         §
COUNTY OF DALLAS, TEXAS,                 §
et al.,                                  §
                                         §
                        Defendants.      §

MEMORANDUM OPINION
AND ORDER

In this action by Anglo voters challenging the 2011 map for electing commissioners

of the Dallas County Commissioners Court, the court must address an objection to plaintiffs'

standing and decide whether plaintiffs are entitled to proceed to trial on their claims under

§ 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301 *et seq*., and the Equal

Protection Clause of the Fourteenth Amendment.  For the reasons that follow, the court

concludes that there is a genuine issue of fact regarding whether plaintiffs have standing, that

plaintiffs' racial gerrymandering and alternative equal protection claims must be dismissed,

but that their other claims remain for trial.

I

Defendant County of Dallas, Texas is governed by a Commissioners Court comprised

of four county commissioners, elected from single member districts, and a county judge, who

is elected county-wide.[1]  *See* Tex. Const. art V, § 18(b).  Following the 2010 Census, Dallas County Judge Clay Lewis Jenkins ("Judge Jenkins") and then-county commissioners Maurine Dickey ("Commissioner Dickey"), Mike Cantrell ("Commissioner Cantrell"), John Wiley Price ("Commissioner Price"), and Dr. Elba Garcia ("Commissioner Garcia") determined that it was necessary to redraw district lines because the map (the "Benchmark Map") drawn after the prior census had become malapportioned.  The Commissioners Court concluded that the Benchmark Map violated the one-person, one-vote requirement of the Equal Protection Clause because Dallas County's population had grown disproportionately in Commissioners Court districts ("CCDs") 3 and 4.

In early 2011, legal counsel for the Commissioners Court retained Matt Angle ("Angle"), an expert on North Texas geography and demographics, to assist in drawing and presenting redrawn redistricting maps for consideration.  The parties appear to agree that, in crafting redrawn districts, Angle began his work with CCD 4, which was significantly overpopulated in the Benchmark Map.  Defendants maintain that, in redrawing CCD 4, Angle aimed to retain its geographical core in Grand Prairie, North Oak Cliff, and South Irving, and to retain its preexisting status as a district in which Hispanic voters could elect their candidate of choice.  The parties disagree, however, as to the order in which Angle drew

---

[1]Because both sides move for summary judgment, the court will recount the evidence that is undisputed, and, when it is necessary to set out evidence that is contested, will do so favorably to the side who is the summary judgment nonmovant in the context of that evidence.  *See, e.g., GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718 n.4 (N.D. Tex. 2010) (Fitzwater, C.J.) (quoting *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.)).

the remaining districts and his motivation in crafting the new boundaries.

According to plaintiffs, after Angle drew CCD 4, he drew a version of CCD 3 that retained a large enough African-American population to ensure that it could elect that community's preferred candidate to the Commissioners Court. They contend that he next drew versions of what started as CCD 2 but was later re-labeled CCD 1, and that Angle intentionally drew that CCD to be a "majority-minority" district, i.e., the district's non-Anglo population would constitute a majority. Plaintiffs maintain that "[w]hat was left in each of Mr. Angle's proposed maps after drawing those three (3) CCDs on the basis of race was the CCD that became CCD 2. In its final form, that CCD would have a [voting age population] that was 64% Anglo." Ps. 12/1/17 Br. 8.

Defendants offer a different version of how Angle re-drew the maps. They posit that, after drawing CCD 4, Angle turned to CCD 1, "aiming to increase its total population to comply with the one-person, one-vote rule, to preserve its geographic core of Park Cities, far North Dallas, Carrollton, and Richardson, and to create the 'conservative' or 'Tea Party' precinct Commissioner Dickey had advocated" during public comments about the redistricting process, Ds. 12/1/17 Br. 7; that Angle next turned to CCD 3, aiming to decrease its total population while maintaining its geographical core in south Dallas and the suburban areas of DeSoto, Lancaster, and Balch Springs, "to address concerns that it packed racial and language minority voters—a concern under the [VRA], and to retain its preexisting status as a precinct in which black voters could elect their candidate of choice," *id.*; and, finally, that Angle worked on CCD 2, aiming to retain much of its core territory while uniting

neighborhoods in east Dallas and other nearby communities with more urban than suburban identity.

After considering the merits of each of four potential maps that Angle had prepared, the Commissioners Court selected one map—the predecessor to the map that was eventually enacted—for public consideration. The Commissioners Court then provided notice and held a series of three public hearings related to the proposed redistricting. Just before the Commissioners Court vote, at the request of Commissioner Price, Angle amended the proposed plan to switch the numbering of CCDs 1 and 2.[2]

In June 2011, by a vote of three to one,[3] the Commissioners Court adopted the new map that Angle had drawn ("2011 Map"). The current composition of the Commissioners Court, elected pursuant to the 2011 Map, is as follows: Dr. Theresa M. Daniel ("Commissioner Daniel") (CCD 1, Democrat); Commissioner Cantrell (CCD 2, Republican); Commissioner Price (CCD 3, Democrat); Commissioner Garcia (CCD 4, Democrat), and Judge Jenkins (Democrat). Two of the four commissioners (Commissioners Cantrell and Daniel) and Judge Jenkins are Caucasian, non-Hispanic ("Anglo").

In January 2015 plaintiffs Anne Harding ("Harding"), Ray Huebner ("Huebner"), Gregory R. Jacobs ("Jacobs"), Morgan McComb ("McComb"), and Johannes Peter Schroer

---

[2]Defendants maintain that the requested district number swap was beneficial to incumbent Republican Commissioner Cantrell, the candidate of choice of Anglo voters, because it resulted in his next standing for election in 2014 rather than in 2012.

[3]Commissioner Dickey did not vote.

("Schroer")[4] sued defendants County of Dallas, Texas, Judge Jenkins, and Commissioners Daniel, Cantrell, Price, and Garcia (collectively, the "County Commissioners"),[5] alleging claims under § 2 of the VRA and under the Equal Protection Clause of the Fourteenth Amendment.[6]

Defendants move for summary judgment, and plaintiffs move for partial summary judgment on their racial gerrymandering claim.

## II

When a summary judgment movant will not have the burden of proof on a claim at trial, the movant can obtain summary judgment by pointing the court to the absence of evidence on any essential element of the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant does so, the nonmovant must go beyond its pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable trier of fact could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[4]On July 10, 2015 the court granted plaintiffs' unopposed motion for leave to file a second amended complaint adding Holly Knight Morse as a plaintiff. On April 5, 2016 the court granted plaintiffs' unopposed motion to withdraw plaintiff McComb, and on May 10, 2017 the court granted plaintiffs' unopposed motion to withdraw plaintiff Huebner.

[5]Judge Jenkins and the County Commissioners are sued only in their official capacities.

[6]Although plaintiffs do not specify that their equal protection claims are brought under 42 U.S.C. § 1983, the court assumes that they are.

- 5 -

(1986).  The nonmovant's failure to produce proof as to any essential element renders all other facts immaterial.  *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.).  Summary judgment is mandatory where the nonmovant fails to meet this burden.  *Little*, 37 F.3d at 1076.

To be entitled to summary judgment on a claim or defense for which the movant will have the burden of proof at trial, the movant "must establish 'beyond peradventure all of the essential elements of the claim or defense.'"  *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).  This means that the movant must demonstrate that there are no genuine and material fact disputes and that the movant is entitled to summary judgment as a matter of law.  *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003).  "The court has noted that the 'beyond peradventure' standard is 'heavy.'"  *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) ( Fitzwater, J.)).

III

Defendants move for summary judgment on the ground that plaintiffs lack standing to bring this action because they have suffered no injury and the harm about which they complain is unlikely to be redressed by the requested relief.

A

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by

statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). It is well settled that "the issue of standing is one of subject matter jurisdiction." *Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006). The doctrine of standing addresses the question of who may properly bring suit in federal court, and "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). It "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To establish standing, a plaintiff must meet both constitutional and prudential requirements. *See, e.g., Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001). The only issue in this case is constitutional standing, which requires that a litigant establish three elements: (1) injury-in-fact that is concrete and actual or imminent, not hypothetical; (2) a fairly traceable causal link between the injury and the defendant's actions; and (3) that the injury will likely be redressed by a favorable decision. *E.g., Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009). To obtain injunctive relief, a plaintiff must be "likely to suffer future injury." *City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief[.]" *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974). The threat of future injury to the plaintiff "must be both real and immediate, not conjectural or hypothetical." *Lyons*, 461 U.S. at 102 (quotation marks omitted).

B

Plaintiffs are Anglo residents of each of the four Dallas County CCDs, as redistricted

under the 2011 Map. Defendants contend that plaintiffs lack standing to bring this action because they have admitted to facts showing that they have suffered no injury.

Defendants rely on plaintiff Harding's deposition testimony that she has never interacted with the Commissioners Court or any commissioners, including her commissioner (Commissioner Garcia), and that her objection is not race-based, but rests instead on her belief that the 2011 Map was drawn to favor Democrats.

Defendants maintain that plaintiff Jacobs was unable to identify any issue or vote of Commissioner Daniel with which he disagreed; that he testified that he would support Commissioner Daniel if she were a Republican and that he had never been denied any request from the Commissioners Court; that he could not cite an example of anything the Commissioners Court had done that came out differently than he would have hoped; that he could not describe any direct harm that he had personally suffered as a result of the 2011 Map; and that he does not reside in either of the two Anglo-majority districts that plaintiffs propose.[7]

Defendants contend that plaintiff Holly Knight Morse ("Morse") was unaware of any

_____

[7]Defendants contend that Jacobs "does not reside in either of the two Anglo-majority districts plaintiffs propose, and thus even if he had some injury, it would not be redressed by the remedy plaintiffs seek." Ds. 12/1/17 Br. 22. In support of this argument, they cite *Raines v. Byrd*, 521 U.S. 811, 818 (1997). Although *Raines* addresses Article III standing, it does so in the context of a challenge by individual Members of Congress to an Act of Congress, i.e., "legislative standing." *Id.* at 820. It does not purport to address standing under the VRA. Accordingly, without suggesting a view on how the court will rule following a trial, it declines to dismiss Jacobs as a plaintiff at the summary judgment stage based on defendants' reliance on *Raines*.

- 8 -

facts that would lead her to believe the 2011 Map harms her voting rights as a Caucasian; that she could not describe any reason to believe she was being insufficiently represented, could not describe any occasion in which the Commissioners Court was unresponsive to her, and has no complaints about any split cities, neighborhoods, or political districts; and that her only complaint about her commissioner is that he is insufficiently conservative.

Defendants posit that plaintiff Schroer has never contacted or expressed any concerns to the Commissioners Court about any issue.

Defendants also contend that, because the remedy that plaintiffs propose is not likely to redress their alleged injury—defendants maintain that plaintiffs' proposed plan would likely result in the election of Democrats to all of the districted seats —plaintiffs cannot meet the "redressability" element of standing.

Plaintiffs respond that a member of a racial minority who resides in a district where that minority has either been "packed" or "cracked" has standing under § 2 of the VRA to challenge the district. They maintain that, because it is undisputed that a plaintiff lives in each CCD and that each plaintiff self-identifies as Anglo, plaintiffs have standing to pursue their § 2 claim, which challenges the "packing" and "cracking" of Dallas County Anglos among the districts. Plaintiffs also contend that, as residents of districts drawn on the basis of race, they also have standing to challenge the districts through their first equal protection claim.

In reply, defendants acknowledge that residing in a challenged district and being a member of a purportedly diluted class of votes "might trigger a presumption of standing."

Ds. 1/5/18 Reply 2.  But they contend that they have produced evidence that plaintiffs have suffered no particularized harm; that plaintiffs have not introduced any "specific facts" showing the presence of a particularized harm; that plaintiffs have not responded to their "redressability" argument; and that defendants are therefore entitled to summary judgment on the issue of standing.

C

The court first considers whether plaintiffs have standing to bring a vote dilution claim under § 2 of the VRA.

1

"[A]n intentional vote dilution claim alleges that the [governing body] has enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities."  *Perez v. Abbott*, 253 F.Supp.3d 864, 939 (W.D. Tex. 2017) (three-judge court) ("*Perez I*") (citing *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).[8] "In the context of single-member districts, the usual device for diluting minority voting power is the manipulation of district lines," either by dividing the minority group among various districts ("fragmenting" or "cracking") or concentrating minority voters within a district ("packing").  *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993); *Perez I*, 253 F.Supp.3d at 939.  In other words, the "'[d]ilution of racial minority group voting strength may be caused' either 'by the dispersal of [minorities] into districts in which they constitute an

---

[8]Defendants maintain that plaintiffs have alleged only a § 2 "results" violation, and not a § 2 "intent" violation.  Ds. 12/1/17 Br. 23 n.2.

ineffective minority of voters or from the concentration of [minorities] into districts where they constitute an excessive majority.'" *Voinovich*, 507 U.S. at 154 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986)); *see also Shaw v. Hunt*, 517 U.S. 899, 914 (1996) ("[A] Plaintiff may allege a § 2 violation in a single-member district if the manipulation of districting lines fragments politically cohesive minority voters among several districts or packs them into one district or a small number of districts, and thereby dilutes the voting strength of members of the minority population.").

"No circuit has developed a framework specifically for a Section 2 standing inquiry." *Pope v. Cnty. of Albany*, 2014 WL 316703, at *5 n.13 (N.D.N.Y. Jan. 28, 2014). Several district courts, however, have addressed the question of standing where, as here, plaintiffs challenge "the 'packing' and 'cracking'" of the racial minority in order to dilute its voting strength. Ps. 12/22/17 Br. 7. In *Barnett v. City of Chicago*, 1996 WL 34432 (N.D. Ill. Jan. 29, 1996), a class of African-American and Latino residents of the city of Chicago challenged under § 2 of the VRA the City's "deliberate[] manipulat[ion]" of ward boundaries "to dilute their voting strength and limit the number of wards in which they have an opportunity to elect candidates of their choice." *Id.* at *1. The court concluded that plaintiffs had standing to bring their "fracturing" claim:

> [c]ontrary to the Defendants' assertions, the *Barnett* Plaintiffs allege that many of their class members live in white majority wards which could be redrawn into majority African American wards. Moreover, contrary to the Defendants' assertions, the *Bonilla* Plaintiffs allege that at least one of their class members lives in a majority white ward that could be redrawn. The Plaintiffs allege, then, that they are minorities, some of whom

> live in fractured wards, and that they seek to enforce their voting
> rights. We conclude that, for purposes of standing, that is
> sufficient to establish an individualized injury-in-fact.

*Id.* at \*4; *see also Shaw*, 517 U.S. at 914 ("[A] plaintiff may allege a § 2 violation in a single-member district if the manipulation of districting lines fragments politically cohesive minority voters among several districts . . . and thereby dilutes the voting strength of members of the minority population."); *Broward Citizens for Fair Districts v. Broward Cnty.*, 2012 WL 1110053, at \*3 (S.D. Fla. Apr. 3, 2012) ("[T]o demonstrate an injury in fact, a vote dilution plaintiff must show that he or she (1) is registered to vote and resides in the district where the discriminatory dilution occurred; and (2) is a member of the minority group whose voting strength was diluted."); *Comm. for a Fair & Balanced Map v. Ill. Bd. of Elections*, 2011 WL 5185567, at \*1 n.1 (N.D. Ill. Nov. 1, 2011) (same).

The *Barnett* court held that the plaintiffs also had standing to bring their "packing" claim:

> Plaintiffs allege that many of their class members live in packed
> wards which could be redrawn into non-excessive majority
> African American wards. The Plaintiffs allege, then, that they
> are minorities, some of whom live in packed wards, and that
> they seek to enforce their voting rights. . . . We conclude that,
> for purposes of standing, that is sufficient to establish an
> individualized injury-in-fact.

*Barnett*, 1996 WL 34432, at \*5 (citations omitted).

More recently, in *Perez v. Abbott*, 267 F.Supp.3d 750 (W.D. Tex. 2017) ("*Perez II*") (three-judge court), the district court held that "plaintiffs who reside in a reasonably compact area that could support an additional minority opportunity district have standing to pursue

§ 2 claims, even if they currently reside in an opportunity district." *Id.* at 775. It reasoned that the "personalized injury is 'that the apportionment of 4 [majority-minority districts] to the sufficiently numerous and geographically compact minority population, as opposed to the 5 [majority-minority districts] that Plaintiffs contend are required by the VRA, dilutes Plaintiffs' individual voting power—including those in existing [majority-minority districts].'" *Id.* at 774 (quoting *Pope*, 2014 WL 316703, at *5).

2

The court concludes that there is a genuine issue of fact regarding whether plaintiffs have suffered a legally cognizable injury-in-fact for purposes of their vote dilution claim under § 2 of the VRA. Plaintiffs allege that the 2011 Map illegally dilutes the votes of Harding, Jacobs, and Schroer by isolating them and others like them in CCDs in which they have a less-than-equal opportunity to elect the candidate preferred by their racial minority. They contend that the Commissioners Court could have drawn two reasonably compact CCDs with an Anglo citizen voting age population ("CVAP") of more than 50%.[9] And they have adduced undisputed evidence that Harding lives in CCD 4 and self-identifies as either Anglo or white; that Jacobs lives in CCD 1 and self-identifies as "white or Caucasian"; that Schroer lives in CCD 3 and self-identifies as a member of Dallas' Anglo community; and that CCDs 1, 3, and 4 retain non-Anglo majorities. Under the rationale of *Barnett*, the court

---

[9]In their briefs, plaintiffs and defendants both refer to plaintiffs' proposed map. *See, e.g.,* Ds. 12/1/17 Br. 23. The map is in the report of plaintiffs' expert, Peter Morrison, Ph.D. ("Dr. Morrison"). Defendants' expert, Angle, criticizes Dr. Morrison's proposed re-drawn map in his expert report, which defendants include in their appendix.

concludes that there is a genuine fact issue whether Harding, Jacobs, and Schroer have suffered a legally cognizable injury-in-fact, i.e., that their votes have been diluted through "cracking," to use plaintiffs' preferred terminology.

There is a also genuine fact issue whether Morse has suffered a cognizable injury-in-fact. Plaintiffs allege that Morse's vote has been illegally wasted as a result of the 2011 Map's super-concentrating it in CCD 2, "a [district] where [her] racial minority is so drastically over-represented as to substantially waste . . . Morse's vote." 2d Am. Compl. ¶ 28. As with Harding, Jacobs, and Schroer, plaintiffs contend that the Commissioners Court could have drawn two reasonably compact CCDs with an Anglo CVAP of more than 50%. Plaintiffs have adduced evidence that Morse lives in CCD 2 and self-identifies as part of the "Caucasian" minority of Dallas County, and that CCD 2 "remains overwhelmingly Anglo." Ps. 12/22/17 Br. 5. They also provide expert evidence that two, not just one, Anglo opportunity CCDs can be drawn for Dallas County. The court concludes that there is a genuine fact issue whether Morse has suffered a cognizable "packing" injury-in-fact for purposes of plaintiffs' § 2 claim. *See Perez II*, 267 F.Supp.3d at 775; *Pope*, 2014 WL 316703, at *5; *Barnett*, 1996 WL 34432, at *5.

3

Having concluded that there are genuine fact issues as to whether plaintiffs have suffered cognizable injuries-in-fact for purposes of their VRA claim, the court now turns to the remaining elements of constitutional standing. Defendants do not dispute the "causation" element, but they contend that plaintiffs "lack standing because the remedy they propose with

their own plan does not cure the harm they do complain of." Ds. 12/1/17 Br. 23. According to defendants, "plaintiffs' proposed plan would likely elect Democrats to all of the districted seats." *Id.*

Section 2 of the VRA provides:

> [n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of *race or color*[.]

52 U.S.C. § 10301(a) (emphasis added). In other words, the VRA is not concerned with discrimination based on party status; it focuses instead on *race* or *color* and the rights of minority citizens to elect their preferred candidates. 52 U.S.C. § 10304(b); *see also Perez v. Abbott*, 250 F.Supp.3d 123, 213 n.86 (W.D. Tex. 2017) (three-judge court) ("[T]he VRA is concerned with racial motives and not others."). Accordingly, evidence that plaintiffs' proposed plan would likely elect Democrats to all of the districted seats is not dispositive of the redressability inquiry.

Moreover, the "injury" about which plaintiffs complain focuses on the *opportunity* to elect candidates preferred by the racial minority. *See, e.g., Perez II*, 267 F.Supp.3d at 774 (holding that denial of "substantial proportionality of political opportunity" under the existing voting system is the "putative injury" suffered by a minority bringing a § 2 claim). A remedy that provides plaintiffs with an equal opportunity to participate in the electoral process and to elect representatives of their choice would sufficiently redress their claimed injury.

The court has concluded above that there are genuine fact issues as to whether plaintiffs have suffered cognizable injuries-in-fact for purposes of their VRA claim. The redressability requirement is satisfied if it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Bennett*, 520 U.S. at 167. Plaintiffs have presented sufficient evidence to create a genuine fact issue regarding whether the creation of two Anglo opportunity CCDs in Dallas County would redress the dilution and wasting of Anglo votes. Accordingly, the court concludes that the question whether plaintiffs have satisfied the "redressability" requirement of standing must be resolved at trial.

D

The court now considers whether there is a genuine issue of fact concerning plaintiffs' standing to bring an equal protection claim.

"If a plaintiff meets the standing requirement under the [VRA], he has also satisfied the requirements for a voting claim brought pursuant to the fourteenth amendment." *Broward Citizens for Fair Districts*, 2012 WL 1110053, at *3 (citing *Perry-Bey v. City of Norfolk*, 678 F.Supp.2d 348, 362 (E.D. Va. 2009)). Moreover, the Supreme Court has held that "[w]here a plaintiff resides in a racially gerrymandered district, . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." *United States v. Hays*, 515 U.S. 737, 744-45 (1995); *see also Miller*, 515 U.S. at 910-911. For the reasons explained above, the court concludes there is a genuine issue of fact concerning plaintiffs' standing to bring an intentional vote dilution claim under the Equal Protection Clause of the Fourteenth

Amendment.

The court need not address whether plaintiffs have standing to bring a *Shaw*[10]-type equal protection claim because it concludes next, in § IV, that plaintiffs have not pleaded a claim for racial gerrymandering.

IV

Having decided that this case should not be dismissed at the summary judgment stage for lack of standing, the court now turns to the merits, beginning with defendants' contention that they are entitled to summary judgment on plaintiffs' racial gerrymandering claim because this claim has not been pleaded.

A

Defendants maintain that plaintiffs do not allege a racial gerrymandering claim because they do not mention "racial gerrymandering" or "*Shaw v. Reno*" in the second amended complaint, and, instead, present their Fourteenth Amendment claim "exclusively as an intentional vote dilution claim." Ds. 12/1/17 Br. 40.

Plaintiffs respond that the second amended complaint contains the same allegations that the three-judge court in *Perez I*, 253 F.Supp.3d at 933, deemed sufficient to plead a racial gerrymandering claim, i.e., that "race was the predominant factor in the Commissioners Court's crafting of the [2011 Map] as a whole and in the design of each of the [2011 Map]'s component four (4) CCDs," the incorporation of that allegation, by reference, into the

---

[10]*Shaw v. Reno*, 509 U.S. 630 (1993).

plaintiffs' equal protection claim, and the conclusion that "the facts alleged constitute a denial of the Plaintiffs' rights guaranteed by the Equal Protection Clause of Section 1 of the 14th Amendment to the United States Constitution." Ps. 12/22/17 Br. 17-18 (citations omitted).

In reply, defendants maintain that the second count of plaintiffs' second amended complaint exclusively—and explicitly—alleges only an intentional vote dilution claim (a claim that plaintiffs have now abandoned); that a plaintiff cannot rely on the incorporation of prior *factual* allegations in a complaint to give notice that they are alleging an *additional legal claim* (under the auspice of a single count) beyond the elements of the claim actually described in the count; that *Perez I* is factually distinguishable; and that "[b]y including so much detail and verbiage specific to an intentional vote dilution claim, plaintiffs here made explicitly clear that Count I was a claim for relief for intentional vote dilution, and gave defendants absolutely no reason to believe they *also* alleged a *Shaw*-type racial gerrymandering claim," Ds. 1/5/18 Reply 19-20.

## B

In *Miller* the Supreme Court explained the distinction between a vote dilution claim and a *Shaw*-type equal protection claim:

> *Shaw* recognized a claim "analytically distinct" from a vote dilution claim. Whereas a vote dilution claim alleges that the State has enacted a particular voting scheme as a purposeful device "to minimize or cancel out the voting potential of racial or ethnic minorities," an action disadvantaging voters of a particular race, the essence of the equal protection claim recognized in *Shaw* is that the State has used race as a basis for

- 18 -

separating voters into districts.

*Miller*, 515 U.S. at 911 (citations omitted). Thus in order to prove a racial sorting claim, a plaintiff's

> burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations.

*Id.* at 916.

The court agrees with defendants that plaintiffs have not pleaded a *Shaw*-type claim. Regardless of the facts pleaded elsewhere in the second amended complaint that are adopted via ¶ 30 ("The Plaintiffs restate and incorporate by reference all allegations made in paragraphs 1-23, above."), plaintiffs' equal protection claim is pleaded as a vote dilution claim, and nothing more. In addition to ¶ 30, which incorporates facts from prior paragraphs of the second amended complaint, this is the entirety of how the equal protection claim is alleged:

> The facts alleged constitute a denial to the Plaintiffs of rights guaranteed by the Equal Protection Clause of Section 1 of the 14th Amendment to the United States Constitution. The Commissioners Court crafted the Discriminating Map and each of its four (4) component CCDs to purposefully fragment Dallas's Anglos, dispersing them among the four (4) CCDs without regard to traditional, neutral redistricting principles. The Commissioners Court designed the Discriminating Map to

reduce and lesson Dallas's Anglos' electoral opportunities significantly below the level of opportunities that would have been available under a map compliant with neutral principles. This fragmentation provides undue voting advantages to Dallas's non-Anglo, ethnic-bloc-voting majority. The Discriminating Map was intentionally crafted to allow Dallas's ethnic majority coalition to dominate the Commissioners Court beyond what their voting power and geographic distribution would otherwise suggest and to deny Dallas's Anglos the chance to meaningfully participate in the choice of any commissioner outside of CCD 2.

2d Am. Compl. ¶ 31.

The court therefore holds that plaintiffs' racial gerrymandering claim must be dismissed because they have not pleaded such a claim.

V

Defendants move for summary judgment on plaintiffs' § 2 claim and on plaintiffs' equal protection claim based on vote dilution.[11]

The court has determined from its review of the parties' briefing that the motions on these claims present questions that are better decided in the context of trial, which the court itself will conduct as trier of fact. The court therefore exercises its discretion to deny the motions for summary judgment, even assuming *arguendo* that the parties are entitled to summary judgment on some or all claims. *See, e.g., Benavidez v. Irving Indep. Sch. Dist.*,

_____

[11]Defendants also move for summary judgment on plaintiffs' equal protection claim based on racial gerrymandering, and plaintiffs move for partial summary judgment on this claim. Because the court has concluded above that plaintiffs have not pleaded a racial gerrymandering claim, it need not address this ground of defendants' motion or plaintiffs' motion for partial summary judgment.

No. 3:13-CV-0087-D, at *1 (N.D. Tex. June 3, 2014) (Fitzwater, C.J.) (order) (citing *Anderson*, 477 U.S. at 255 (noting that trial court has discretion to deny summary judgment where "there is reason to believe that the better course would be to proceed to a full trial"); 10A Charles A. Wright, et al., *Federal Practice and Procedure* § 2728, at 526-27 (3d ed. 1998) (recognizing "the court's discretion to deny summary judgment when it otherwise appears that the movant has satisfied the Rule 56 burden," but stating that this discretion "should be exercised sparingly")).

## VI

Defendants move for summary judgment on plaintiffs' alternative equal protection claim on the ground that the Fifth Circuit has made clear that § 2 of the VRA applies to protect any minority group, including Anglo voters where they constitute a minority. Plaintiffs oppose defendants' motion on the ground that two of defendants' retained experts have testified that the VRA does not protect Dallas Anglos. They contend:

> The Court should not allow the Defendants to engage in the gamesmanship of arguing that the race-neutrality of the VRA requires summary judgment against the Alternative Equal Protection Claim today, only to then argue at trial for interpretations of the VRA which, as applied, would render it unconstitutional, exactly as argued in the Alternative Equal Protection Claim.

Ps. 12/22/17 Br. 23. In their reply, defendants clarify that they do not argue that Anglo voters are *precluded* from alleging § 2 claims; they merely allege that the plaintiffs in *this case* have failed to satisfy the elements of a § 2 claim.

It is clearly established in this circuit, as defendants argue in their motion, that the

VRA applies to protect any minority group, including Anglo voters when they constitute a minority.  *See, e.g., United States v. Brown*, 561 F.3d 420 (5th Cir. 2009) (affirming district court's finding of § 2 violation against Anglo voters in majority African-American Mississippi county).  Accordingly, the court grants defendants' motion for summary judgment on plaintiffs' alternative equal protection claim, in which they allege that "[t]o the extent that the Court determines that Dallas's Anglo minority isn't a protected class under Section 2 of the [VRA], the [VRA] denies Dallas's Anglo minority the equal protection of the law guaranteed by the 14th Amendment to the United States Constitution," 2d Am. Compl. ¶ 33.

\*    \*    \*

Accordingly, for the reasons explained, the court grants defendants' motion for summary judgment on plaintiffs' racial gerrymandering and alternative equal protection claims, but otherwise denies defendants' motion for summary judgment.  The court denies plaintiffs' motion for partial summary judgment.

**SO ORDERED**.

March 5, 2018.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE