## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| ANNE HARDING, *et al*., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | C.A. NO. 3:15-CV-0131-D |
| | § | |
| COUNTY OF DALLAS, TEXAS, *et al*., | § | |
| | § | |
| Defendants, | § | |

---

## PRETRIAL ORDER

---

Pursuant to Local Rule 16.4 and the Court's Trial Setting Order (as later amended),[1] the plaintiffs in the above-captioned litigation (the "Plaintiffs") and the Defendants in the above-captioned litigation (the "Defendants") submit the following Joint Pre-Trial Order.

## I.      PLAINTIFFS' CLAIMS

Section 2 of the Voting Rights Act of 1965, as amended, prohibits any standard, practice, or procedure that results in the denial or abridgement of the right of minorities to vote. Specifically, it forbids any electoral system that denies any racial minority an equal opportunity to elect representatives of their choice.

The Plaintiffs contend that the current electoral system in use for elections to the Dallas County Commissioners Court (the "Commissioners Court"), in which four (4) Commissioners are elected from districts enacted in 2011(the "Enacted Plan" or "EP") and the County Judge is elected county wide, intentionally dilutes Anglo voting strength and is not equally open to participation

---

[1] Dkt. 57, Amended by Dkt. 72.

by Dallas's Anglo voters, in violation of both the Voting Rights Act and the 14th Amendment to the U.S. Constitution.[2] This system leaves Dallas's Anglos with less opportunity to participate in the electoral process and to elect representatives of their choice than other voters possess, also in violation of both the Voting Rights Act and the 14th Amendment to the U.S. Constitution.

Plaintiffs will show that: (a) two (2) geographically-compact Commissioners Court districts (each a "CCD" and, when referencing more than one such district, "CCDs") containing a Citizen Voting Age Population ("CVAP") with an Anglo majority could be drawn in Dallas County; (b) Dallas Anglos vote cohesively for their candidates of choice in elections to the Commissioners Court; and (c) the non-Anglo majority of Dallas County voters consistently prevents Dallas's Anglos from electing their candidates of choice to the Commissioners Court. Moreover, Plaintiffs will show that under the totality of circumstances, the Enacted Plan denies Dallas Anglos the same opportunity that other Dallas voters enjoy to participate in the political process and elect representatives of their choice to the Commissioners Court.

Additionally, Plaintiffs will show that Dallas County intentionally diluted the impact of Dallas's Anglo voters, including themselves, through the EP, drawing the EP on the basis of race to craft CCDs 1, 3, and 4 to have non-Anglo majorities (while still assigning to each a "cracked" Anglo population insufficient to afford it the same level of opportunity to elect its preferred candidates to the Commissioners Court as is enjoyed by the rest of the Dallas electorate), and simultaneously assigning a "packed" Anglo super-majority to CCD 2.

## II.    DEFENDANTS' DEFENSES

### A.  Lack of Standing

"To meet the standing requirements of Article III, '[a] plaintiff must allege personal injury

---

[2] Throughout the Parties' Joint Pre-Trial Order, they refer to non-Hispanic, White persons as "Anglos[.]"

2

fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)) (emphasis and bracket in original). The Supreme Court "has stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." *Id.* A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, and n.1 (1992)). The Defendants contend that the Plaintiffs lack standing to bring this action because they have admitted they suffer no injury.

B.  Section 2 Claim

Defendants will show that Dallas County's Anglo community is not politically cohesive and therefore cannot meet the preconditions in a Section 2 vote dilution case as required by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 49-51 (1986).  Moreover, the Defendants contend that the Plaintiffs cannot create another reasonably compact district that includes a sufficiently large Anglo population to allow Anglo voters to elect candidates of their choice. *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994).

Finally, even if the Plaintiffs could meet their burden on those elements, they must further prove that under the totality of the circumstances, "they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." *Johnson v. DeGrandy*, 512 U.S. 997, 1008 (1994).  *See also, League of United Latin Am. Citizens, Council No. 4434 v. Clements,* 999 F.2d 831, 849 (5th Cir. 1993) (*en banc*).  "Courts are guided in this second inquiry by the so-called *Zimmer* factors listed in the Senate Report."  *Id.*  The Defendants maintain that, the Plaintiffs are unable to meet the totality of circumstances under Section 2 because they cannot prove a sufficient number of these factors to meet their burden of

showing "totality of the circumstances" in their favor.

In addition, the Plaintiffs must show that the proposed number of majority-Anglo districts is proportional with the Anglo group's share of the population. Section 2 guarantees "equal political and electoral opportunity," not entitlement to the maximum possible number of reasonably compact majority-minority districts. *See De Grandy*, 512 U.S. at 1022. Defendants contend that Anglos have already attained proportional representation because they enjoy the maximum possible number of reasonably compact, effective Anglo-majority districts under the Enacted Plan.

### C.  Intent Claim

The Defendants argue that a showing of intentional vote-dilution is a separate claim from the Plaintiffs' Section 2 vote dilution claim. The Defendants maintain that the Plaintiffs have abandoned their intent claim. The Plaintiffs offered no expert reports on intent. More importantly, the Defendants contend that the Plaintiffs did not offer briefing or evidence at the summary judgment stage, to support an intent claim and therefore that claim has been abandoned. *See Magee v. Life Insurance Co. of North America*, 261 F. Supp. 2d 738, 748 n.10 (S.D. Tex. 2003) (holding legal argument advanced by summary judgment movant but not addressed in opposition brief waived). Also, the Defendants understand the Court to have stated that Plaintiffs have abandoned what the Defendants style the Plaintiffs' statutory intent claim. *See* ECF 106, p. 18 ("In reply, defendants maintain that the second count of plaintiffs' second amended complaint exclusively— and explicitly—alleges only an intentional vote dilution claim (a claim that plaintiffs have now abandoned)").

The Defendants further contend that the Plaintiffs cannot prove intentional vote dilution anyway. In assessing "whether invidious discriminatory purpose was a motivating factor in a

government body's decisionmaking," *Perez v. Abbott*, No. 11-360, 2017 WL 3495922, at *10 (W.D. Tex. Aug. 15, 2017), *stayed pending appeal*, 138 S. Ct. 1 (2017), courts can look to the factors set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268 (1977). The "important starting point" for the *Arlington Heights* analysis is "the impact of the official action whether it bears more heavily on one race than another." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 489 (1997) (quoting *Arlington Heights*, 429 U.S. at 266). The other factors include "historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes," "the specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," substantive departures, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," and "[t]he legislative . . . history[,] . . . especially where there are contemporary statements by members of the decisionmaking body." *Arlington Heights*, 429 U.S. at 267-68.

Not only do the Defendants maintain that none of the *Arlington Heights* factors are present in this case, but they also contend that the entire premise of the Plaintiffs' intentional discrimination claim—that the CCDs were cracked and packed on the basis of race to dilute the votes of Anglos—is factually wrong. The Defendants believe that the evidence shows that neutral redistricting principles drove the placement of district boundaries, and none of the evidence necessary to prove intentional discrimination exists in this case.

### III.   STATEMENT OF STIPULATED FACTS

1.     Dallas County is governed by the Commissioners Court, which, by operation of state law, is comprised of four commissioners elected from CCDs and a county judge, who is elected county-wide.

2.      Statewide, from 2000 to 2010, Texas experienced dramatic population growth, with a population increase of over 20 percent – approximately 4.3 million persons.  Much of this population growth took the form of growth in the population of Texas's Hispanics (41.8% growth), African Americans (23.9% growth), and other non-Anglo residents.  The Texas Anglo population grew at a significantly slower rate (4.2 percent).

3.      In Dallas County, overall population grew by 6.7% over that period (a population increase of 149,240 people).  Over that same period, Dallas saw significant growth among its Hispanic population (243,211 people) and African-American population (73,016 people), coupled with a decrease in its Anglo population (198,624 people).

4.      Countywide, the Anglo share of total population decreased from 44.3% in 2000 to 33.1% in 2010.  The Hispanic share of total population increased from 29.9% in 2000 to 38.3% in 2010.  The African-American share of total population increased from 20.1% in 2000 to 21.9% in 2010.

5.      The 2010 census reflected that Anglos constituted a minority of Dallas County's total population.

6.      The 2010 census reflected that Anglos constituted a minority of Dallas County's Voting Age Population ("VAP").

7.      Dallas's population growth between 2000 and 2010 was weighted to the southern and western regions of the county in areas largely then lying in the predecessors of CCD 3 and CCD 4 then in effect (in the "Benchmark Map" or in the "Benchmark CCDs"), but also extending into neighborhoods within Benchmark CCD 2.

8.      With overall population of Dallas County increasing to 2,368,139, the ideal population of each CCD in 2011 was 592,035.

9.     The population deviation of the Benchmark CCDs as reflected in the 2010 census exceeded the 10% overall population deviation of the equal population standard.  Benchmark CCD 1 was -11.6%, well below the ideal population.  Benchmark CCD 4 was +9.8%, well above the ideal population. Benchmark CCD 3 was above the ideal at +3.4%.  Benchmark CCD 2 was marginally below the ideal at -1.6%.  The overall population deviation of the Benchmark CCDs, as reflected in the 2010 census, was 21.4%.

10.    As shown by the table below, demographically, the two Benchmark CCDs above the ideal population – Benchmark CCDs 3 and 4 – also had, by far, the highest number of Hispanic and African-American residents, with combined African-American and Hispanic populations of 83.2% and 65.5%, respectively.  Sizable African American and Hispanic populations also resided within Benchmark CCD 2, which had a combined African-American plus Hispanic population of 50%.

**Benchmark Map Population by Race**

| District | ANGLO POP | HISP POP | BLACK POP | BH POP | OTHER POP | VAP ANGLO | VAP HISP | VAP BLACK | VAP BH | VAP OTHER |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 271,825 | 161,210 | 54,184 | 213,072 | 38,638 | 229,786 | 105,715 | 39,363 | 143,825 | 30,609 |
| 2 | 248,670 | 190,071 | 104,303 | 291,008 | 42,666 | 202,491 | 116,841 | 68,045 | 183,421 | 31,399 |
| 3 | 92,849 | 234,504 | 279,499 | 509,207 | 10,279 | 82,512 | 144,788 | 202,009 | 344,500 | 8,360 |
| 4 | 171,346 | 320,150 | 110,153 | 425,664 | 52,905 | 143,097 | 202,483 | 74,813 | 275,088 | 38,778 |

11.    The 2010 census reflected that Anglos constituted a minority of the VAP of three (3) Benchmark CCDs.

12.    As these population and demographic changes were taking place within Dallas County between 2000 and 2010, the performance of Democratic candidates in countywide races improved and, by decade's end, Democrats had emerged as the dominant party in Dallas County elections.

13.     In 2004, the Democratic straight-ticket vote in Dallas County exceeded the Republican straight-ticket vote by approximately 13,000 votes.  That election saw Democratic Sheriff candidate Lupe Valdez prevail countywide, along with Democratic judicial candidates Don Adams, Lorraine Raggio, and Denise Garcia.

14.     In 2006, Democratic straight-ticket voting exceeded Republican straight ticket voting by over 16,000.  That election saw every county-wide Democratic candidate prevail. Democratic Agriculture Commissioner nominee Hank Gilbert and Democratic State Supreme Court nominee Bill Moody also carried Dallas County.

15.     Democratic candidate performance countywide further improved in 2008.

16.     In the 2010 election cycle, Dallas County Democrats continued to prevail in county-wide elections, while Democrats suffered major losses nationally and statewide.  Texas Democrats lost Texas State House seats both statewide and in Dallas County.

17.     In 2010, Democratic candidate Elba Garcia defeated Republican incumbent Ken Mayfield in Benchmark CCD 4, providing a Democratic Commissioners Court majority.

18.     Following the 2010 Census, it was necessary for the Commissioners Court to enact new CCD lines, because the Benchmark Map had become malapportioned.

19.     The following was the makeup of Dallas County's Citizen Voting Age Population ("CVAP") according to the American Community Survey's one-year data for 2010: Anglo 47.9%, African-American 26.4% and Hispanic 19.9%

20.     The following was the makeup of Dallas County's CVAP according to the American Community Survey (averaging data for the years 2005-2009): Anglo 51.4%, African-American 24.5% and Hispanic 19.2%.

21.     Beginning in 2009, some conservatives began to form "Tea Party" organizations,

in Dallas and around the nation.

22.     Commissioner Garcia's election in Benchmark CCD 4 followed this development.

23.     Through Dallas County Commissioners Court Order 2011-509, the Commissioners Court engaged J. Gerald Hebert and Rolando Rios as its outside redistricting counsel.

24.     Matt Angle was retained to prepare redistricting plans, perform population analysis, and compile data tables.

25.     In Dallas County Commissioners Court Order 2011-775 (the "Criteria Order"), the Commissioners Court adopted a set of prioritized redistricting criteria that would guide development and consideration of the new redistricting plan.  At the time of redistricting in 2011, the four commissioners were:  Maurine Dickey (Benchmark CCD 1, Republican); Mike Cantrell (Benchmark CCD 2, Republican); John Wiley Price (Benchmark CCD 3, Democrat); and Elba Garcia (Benchmark CCD 4, Democrat).   The County Judge was Clay Jenkins (Democrat). Dickey, Cantrell, and Jenkins are Anglos; Price is African American; and Garcia is Hispanic.

26.     The Criteria Order enumerated seven redistricting criteria and prioritized them as follows: (1) complying with the one-person, one-vote requirement of the U.S. Constitution, (2) complying with the Voting Rights Act, including Section 5's prohibition on retrogression of racial and language minorities' ability to elect candidates of choice and Section 2's requirement that Districts be configured to permit racial and language minorities "the opportunity to elect their candidate of choice where their populations are sufficiently large and compact," (3) respecting population increases and decreases in Dallas County over the decade, (4) respecting boundaries of voting tabulation districts where possible, and if not possible, creating voting Districts that ensure adequate polling place facilities, (5) considering completely redrawn maps, rather than single District maps, (6) respecting municipal and geographic boundaries (but subsidiary to requirements

of Constitution and Voting Rights Act), and (7) creating geographically compact Districts composed of contiguous territory (but subsidiary to requirements of Constitution and Voting Rights Act).

27.    By the time the Commissioners Court considered redistricting in 2011, Commissioner Dickey had announced her intent not to seek reelection, resulting in an open seat for CCD 1.

28.    Mr. Angle began his work by designing CCD 4.  Because CCD 4 was overpopulated, among Mr. Angle's aims in crafting CCD 4 was to shift population out of the district to achieve compliance with the equal population requirements,  while assuring that it would continue to allow Hispanic voters the opportunity to elect their candidate of choice.

29.    The 2010 Census indicated that the newly designed CCD 4 had a 52.1% Hispanic VAP, a combined African-American and Hispanic VAP of 66.7%, and an Anglo VAP of only 26.8%.

30.    Commissioner Elba Garcia had no opponent in either the 2014 CCD 4 primary or general election.

31.    Mr. Angle testified that District 3 in the benchmark plan "was heavily African-American plus Latino far beyond what election returns appear[] to show . . . [were] require[d] to elect the African-American candidate of choice."

32.    The 2010 Census indicated that the newly designed CCD 3 had a combined African-American and Hispanic VAP of 68.1% and an Anglo VAP of only 28.9%.

33.    Commissioner John Wiley Price prevailed in 2012 and 2016 CCD 3 general elections.

34.     The 2010 Census indicated that CCD 1 had a combined African-American and Hispanic VAP of 62.1% and an Anglo VAP of only 32.9%.

35.     Commissioner Theresa Daniel prevailed in the 2012 and 2016 CCD 1 general elections.

36.     The 2010 Census indicated that CCD 2 had a combined African-American and Hispanic VAP of only 25.4% and an Anglo VAP of 64.0%.

37.     Commissioner Mike Cantrell had no opponent in either the 2014 CCD 2 primary or general election.

38.     Mr. Angle has testified that "the population makeup of all these districts mattered" to how he crafted the four (4) CCDs in the EP.

39.     The Commissioners Court held public hearings in 2011 to solicit public input with respect to its 2011 redistricting plan.

40.     Through Dallas County Commissioners Court Order 2011-1015, the Commissioners Court enacted the EP.

41.     Prior to the June 7, 2011 Commissioners Court meeting, at Commissioner Price's request, Mr. Angle amended the proposed plan to switch the numbering of CCDs 1 and 2.

42.     The Commissioners Court approved the EP through Dallas County Commissioners Court Order 2011-1015 on a 3-1 vote, with the support of Judge Jenkins, Commissioner Price, and Commissioner Garcia.  Commissioner Dickey did not vote.

43.     The tables below provide population totals and demographic data for the EP.

**Adopted Map Deviation**

| District | TOTAL | Deviation | % Deviation |
|---|---|---|---|
| 1 | 602,295 | 10,260 | 1.7% |
| 2 | 578,677 | -13,358 | -2.3% |
| 3 | 573,294 | -18,741 | -3.2% |
| 4 | 613,873 | 21,838 | 3.7% |

*Ideal District is 592,035

**Adopted Map Population by Race**

| District | ANGLO POP | HISP POP | BLACK POP | BH POP | OTHER POP | VAP ANGLO | VAP HISP | VAP BLACK | VAP BH | VAP OTHER |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 161,630 | 288,950 | 127,415 | 412,076 | 28,589 | 140,298 | 179,445 | 87,602 | 264,983 | 21,651 |
| 2 | 348,298 | 115,314 | 54,182 | 167,381 | 62,998 | 282,266 | 75,175 | 38,035 | 112,166 | 46,751 |
| 3 | 140,303 | 146,271 | 274,763 | 416,720 | 16,271 | 118,843 | 89,080 | 192,947 | 280,078 | 12,416 |
| 4 | 134,462 | 355,405 | 91,781 | 442,781 | 36,630 | 116,482 | 226,132 | 65,648 | 289,614 | 28,328 |

**Adopted Map Percentage of Total Population by Race**

| District | PCT ANGLO | PCT HISP | PCT BLACK | PCT BH | PCT OTHER | PCT VAP ANGLO | PCT VAP HISP | PACT VAP BLACK | PCT VAP BH | PCT VAP OTHER |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 26.8% | 48.0% | 21.2% | 8.4% | 4.7% | 32.9% | 42.0% | 20.5% | 62.1% | 5.1% |
| 2 | 60.2% | 19.9% | 9.4% | 8.9% | 10.9% | 64.0% | 17.0% | 8.6% | 25.4% | 10.6% |
| 3 | 24.5% | 25.5% | 47.9% | 2.7% | 2.8% | 28.9% | 21.7% | 46.9% | 68.1% | 3.0% |
| 4 | 21.9% | 57.9% | 15.0% | 2.1% | 6.0% | 26.8% | 52.1% | 15.1% | 66.7% | 6.5% |

44.     Anglos now constitute a minority of Dallas County's VAP, CVAP and total population.

45.     Anglos now constitute a minority of CCD 1, CCD 3, and CCD 4's VAP, CVAP, and total population.

46.     The current Commissioners Court, elected pursuant to the EP, consists of: Theresa Daniel (CCD 1, Democrat); Mike Cantrell (CCD 2, Republican); John Wiley Price (CCD 3, Democrat); Elba Garcia (CCD 4, Democrat); and County Judge Clay Jenkins (Democrat). Commissioners Theresa Daniel and Mike Cantrell appear to be Anglo, as does County Judge Clay Jenkins.

47.     According to the 2011-2015 U.S. Census American Community Survey, Anglos constituted 45.1% of Dallas County's CVAP, while Hispanics constituted 21.9%, and African-Americans constituted 26.7%.

48.     In recent election cycles, the Democratic Party has emerged as the dominant political party in Dallas County elections, with the Democratic Party receiving more straight-ticket votes than the Republican Party, more countywide elected officials than the Republican Party, and more votes for its presidential candidates than the Republican Party's.

49.     The Democratic nominees for U.S President have carried Dallas County in every general election since 2008.

50.     The State of Texas has a long history of discrimination against African-Americans and Hispanics.

51.     Dallas County has no history older than 2011 of official discrimination against its Anglo population.

52.     In 2017, a three-judge federal court in San Antonio found that the State of Texas' 2011 congressional plan had the intent and effect of discriminating against African-American and Latino voters in the Dallas-Fort Worth region.  In that case, the three-judge court stated: "CD30

[in Dallas County] demonstrates a classic racial gerrymandering technique of packing minority [African-American] voters into CD30 to waste their votes, while moving Anglos into neighboring districts to increase their Republican performance.  The Court finds that race was used as a proxy for political affiliation, and that this was done intentionally to dilute minority [African-American] voting strength."

53.    In 2005, the U.S. Supreme Court found that Dallas County District Attorney's Office had, by its own admission, manipulated "the racial composition of the jury in the past," to exclude African-Americans and Latinos. It held that the County Prosecutor had done the same in that case.[3]

54.    A portion of Dallas County Anglos generally vote for Democratic candidates; Professor Matt Barreto, one of the Defendants' experts in this case, has estimated that on average 23% of Dallas County Anglos tend to vote Democratic.

55.    Professor Barreto has estimated that the remaining 77% of Dallas County Anglos tend to vote for Republicans candidates.

56.    Anglos in Dallas County do not bear the effects of past discrimination in areas such as education, employment, and health.

57.    Educational statistics show that Dallas County's Anglo students do not demonstrate lower performance indicators on the State of Texas Assessments of Academic Readiness (STAAR) assessment than do African-American or Hispanic students.

58.    Dallas County's Anglo students do not achieve lower graduation rates or SAT scores than do the county's African-American or Hispanic students.

59.    According to Census data, Anglos in Dallas County do not perform worse than

---

[3] *Miller-El v. Drake*, 544 U.S. 660 (2005).

African-Americans or Hispanics in any of the following categories: income (including percentage living in poverty), educational attainment, holding careers in management/business, unemployment rate, possession of health insurance, and home ownership.

60.     U.S. Census data shows that Anglo business owners in Dallas County do not receive lower average sales receipts than African-American or Hispanic business owners.

61.     U.S. Census data and data from the Texas Legislative Council show that Anglos in Dallas County do not have lower voter turnout than do African-Americans or Hispanics.

62.     There is no slating process for elections in Dallas County.

63.     All four (4) Plaintiffs are Anglos.

64.     All four (4) Plaintiffs are registered to vote in Dallas County.

65.     Plaintiff Gregory R. Jacobs resides in CCD 1 and is represented by Commissioner Theresa Daniel.

66.     Plaintiff Holly Morse resides in CCD 2 and is represented by Commissioner Mike Cantrell.

67.     Plaintiff Johannes Peter Schroer resides in CCD 3 and is represented by Commissioner John Wiley Price.

68.     Plaintiff Anne Harding resides in CCD 4 and is represented by Commissioner Elba Garcia.

69.     None of the Plaintiffs have experienced first-hand racial discrimination against them, as Anglos, other than their claim of discrimination with respect to EP's assignment of CCD boundaries.

70.     None of the Plaintiffs has ever requested assistance from their Commissioner and been denied it.

71.     The Plaintiffs contend that the Enacted Plan CCDs have the following demographic characteristics: CCD 1: 140,554 white CVAP (42.8%); CCD 2: 276,285 white CVAP (69.8%); CCD 3: 195,549 black CVAP and 53,547 Hispanic CVAP (combined 66.6%); CCD 4: 115,934 Hispanic CVAP and 61,063 black CVAP (combined 56.6%).

72.     The Plaintiffs have proposed an alternative redistricting plan that creates two Districts with a majority Anglo CVAP; proposed CCD 2 has an Anglo CVAP of 65.2% and proposed CCD 4 has an Anglo CVAP of 55.1%. The Plaintiffs' proposed CCD 3 increases the combined Black and Hispanic CVAP from 66.6% to 75.2%. The Plaintiffs' proposed District 1 has a combined Hispanic and Black CVAP of 56.7%.

73.     Plaintiffs' expert witness Dr. Morrison stated in his report that Enacted Plan CCD 2 was packed with "70-75 thousand White voters" whose votes are "wasted," The Plaintiffs' proposed CCD 2 reduces the Anglo CVAP by 4.6% from that in the EP to 65.2% or 23,565 voters.

74.     The Plaintiffs' expert Dr. Morrison testified that he views a district with 60% or 65% Anglo CVAP as potentially packed, because the excess Anglos "could have been put in another district where their votes have more influence; rather than being completely wasted."

75.     When asked at his deposition how he reached his conclusion that particular city-splits in the Enacted Plan harmed Anglo voters, Dr. Morrison testified that "I don't rule out the possibility that my entire analysis [of city splits], when it's finally completed and I get all the numbers right, may end up showing there is no real obvious, apparent statistical footprint of intent to pack Anglos. In which case, my conclusion is I guess it wasn't done here, but the demographic data show it was accomplished. How it was accomplished becomes, to me, a peripheral question … an exercise that may add nothing to the substance of the opinion I formed."

76.     The Defendants' experts' analysis of the 2016 election results shows that

Democratic presidential candidate Hillary Clinton and Democratic sheriff candidate Lupe Valdez received similar vote totals in Dallas County, a pattern that held true across the CCDs in the Enacted Plan—both Democratic candidates carried CCDs 1, 3, and 4, while both lost CCD 2, as the following results show:

**2016 Election Results – Enacted Plan**

| District | Sheriff % D | Sheriff % R | President % D | President % R |
|----------|-------------|-------------|---------------|---------------|
| 1 | **66.4%** | 33.6% | **65.4%** | 30.3% |
| 2 | 44.1% | **55.9%** | 45.9% | **49.2%** |
| 3 | **75.4%** | 24.6% | **73.9%** | 23.4% |
| 4 | **68.1%** | 31.9% | **66.0%** | 30.1% |

77.   The Defendants' experts have concluded that, had plaintiffs' proposed plan been in effect, on the other hand, Ms. Clinton and Ms. Valdez would have carried all four CCDs, including the two proposed CCDs with majority Anglo CVAPs (proposed CCDs 2 and 4), as demonstrated in the following chart:

**2016 Election Results – Plaintiffs' Proposed Plan**

| District | Sheriff % D | Sheriff % R | President % D | President % R |
|----------|-------------|-------------|---------------|---------------|
| 1 | **50.6%** | 49.4% | **52.8%** | 42.2% |
| 2 | **83.1%** | 16.9% | **81.7%** | 15.6% |
| 3 | **66.3%** | 33.7% | **64.0%** | 32.1% |
| 4 | **50.8%** | 49.2% | **49.8%** | 46.0% |

78.   The Defendants contend that the Plaintiffs' proposed CCD 2 overlaps with much of Enacted Plan CCD 2, but includes approximately 260,609 people from outside EP CCD 2, with an Anglo CVAP of 53.1%.

79.   The Defendants' experts have concluded that, in the territory where those 260,609 people live, Democrat Hillary Clinton received 67.7% support in the 2016 general election, and Democratic Sheriff Lupe Valdez received 63.3% support in the 2016 general election.

80.   The Defendants' experts have concluded that, in the territory where those 373,782

people live, Democrat Hillary Clinton received 57.7% support in the 2016 general election, and

Democratic Sheriff Lupe Valdez received 57.4% support in the 2016 general election.

## IV.     CONTESTED ISSUES OF FACT AND LAW

**A.     CONTESTED ISSUES OF FACT**

1.      Whether Dallas's Anglo voters are politically cohesive.

2.      Whether it is possible to draw two CCDs that would afford Dallas's Anglo voters an equal opportunity to elect their preferred candidates to the Commissioners Court.

3.      Whether the EP denies Dallas Anglos proportional representation on the Commissioners Court.

4.      Whether Dallas's non-Anglo majority votes sufficiently as a bloc in Commissioners Court elections to enable it—in the absence of special circumstances—usually to defeat the Anglo community's preferred candidates.

5.      Whether the EP provides Dallas Anglos with an equal opportunity to participate in the political process and to elect candidates of their choice.

6.      Whether the totality of circumstances supports a finding that Anglos in Dallas County are entitled to an additional, court-imposed, Anglo-majority district.

7.      Whether Dallas County intentionally diluted the voting strength of Dallas's Anglo community.

8.      Whether political campaigns in Dallas County have been characterized by overt and subtle racial appeals to the detriment of Anglos.

9.      Whether Anglos enjoy electoral success in the CCDs or in other elections in Dallas County.

10.     Whether the EP serves any cognizable policy in ways that are not tenuous.

11.     Whether the Commissioners Court lacks responsiveness to the needs of Dallas's Anglo community.

12.     Whether the Plaintiffs' Demonstration Map violates the traditional redistricting criteria adopted by the Dallas County Commissioners in 2011.

13.     Whether the EP dilutes Anglo voting strength in elections to the CCDs, and thus denies Anglo citizens both the right to meaningfully participate in Commissioners Court elections and an equal opportunity to elect candidates of their choice, so precluding the election of Anglo-preferred Commissioners, in violation of the rights of Anglo voters in Dallas County under VRA § 2 and the 14th Amendment to the U.S. Constitution.

**B.     CONTESTED ISSUES OF LAW**

1.      Whether the Plaintiffs have proven legally cognizable harm such that they have legal standing to bring this action.

2.      In a § 2 case, must plaintiffs prove not only that voting is polarized by race, but that race, rather than non-racial factors, drives the voting decisions of the electorate?

3.      In a § 2 case, is the first *Gingles* prong satisfied by a demonstration that a plaintiff's racial minority is sufficiently numerous and compact that it could constitute a CVAP majority in an additional single-member district, or must plaintiffs also prove that such a district would be likely to perform for Plaintiffs' racial minority through a functionality analysis?

4.      Do Plaintiffs in a § 2 case bear the burden of establishing that their demonstration or remedial plan complies with traditional redistricting principles and/or the criteria adopted by the Commissioners Court.

## V.     <u>ESTIMATED LENGTH OF TRIAL</u>

The parties believe that five (5) to six (6) days, will be sufficient for both sides to present their cases.

## VI.   ADDITIONAL MATTERS THAT MIGHT AID
## IN THE DISPOSITION OF THE CASE

The parties reserve the right to use any Pleadings, Deposition Transcripts, Answers to Interrogatories, Responses to Requests for Admissions, and Responses to Requests for Production of Documents as both substantive and impeachment evidence consistent with the Federal Rules of Evidence and Federal Rules of Civil Procedure.

The parties reserve their rights to raise objections to each other's evidence, witness lists, exhibit lists, and designations of depositions as allowed by this Court's Trial Setting Order (as amended), or to raise such additional matters as allowed by the Court's Trial Setting Order (as amended).  The parties note that the resolution of any such objections and/or other issues will aid in the disposition of this case, even if the parties cannot describe such matters with particularity as this Joint Pre-Trial Order is being negotiated.

The parties also seek guidance from the Court regarding any time limits the Court may impose for opening statements or closing arguments, the presentation of evidence, or any other limits the Court may impose on other matters concerning the trial of this action.

SIGNED on April 12, 2018.

SIDNEY A. FITZWATER
UNITED   STATES   DISTRICT
JUDGE

Prepared and Approved by:

Counsel to the Plaintiffs:                          Counsel to the Defendants

THE MORENOFF FIRM, PLLC                             BRAZIL & DUNN

*/s/ Daniel I. Morenoff*                            */s/ Chad W. Dunn*
Daniel I. Morenoff                                  Chad W. Dunn
Texas Bar No:                                       SBN: 24036507
24032760                                            4201 Cypress Creek Pkwy., Suite 530
P.O. Box 12347                                      Houston, Texas77068
Dallas, Texas 75225                                 Telephone: (281) 580-6310
Telephone: (214) 504-1835                           Facsimile: (281) 580-6362
Facsimile: (214) 504-2633                           chad@brazilanddunn.com
dan.morenoff@morenoff-firm.com
danmorenoff.service@gmail.com                       J. Gerald Hebert (*Pro Hac Vice*)
                                                    VA Bar No. 38432
-AND-                                               J. Gerald Hebert, PC
                                                    191 Somervelle Street, #405
Elizabeth D. Alvarez                                Alexandria, Virginia 22304
Texas Bar No. 24071942                              Telephone: (703) 628-4673
Law Office of Elizabeth Alvarez                     hebert@voterlaw.com
555 Republic Drive Ste 200
Plano, Tx 75074                                     Rolando Leo Rios
Telephone: (972) 422-9152                           SBN:16935900
Facsimile:  (972) 767-3655                          Law Office of Rolando L. Rios
E-mail:                                             115 E. Travis, Suite 1645
Elizabeth@alvareztxlaw.com                          San Antonio, Texas 78205
                                                    Telephone: (210) 222-2102
                                                    Facsimile: (210) 222-2898
                                                    rrios@rolandorioslaw.com

                                                    -AND-

                                                    Peter L. Harlan
                                                    SBN: 09011300
                                                    Dallas County District Attorney's  Office
                                                    Frank Crowley Courts Building
                                                    133 N. Riverfront Blvd., 11th Floor
                                                    Suite C4-2 LB 19
                                                    Dallas, Texas 75207
                                                    Telephone: (214) 653-3690
                                                    Facsimile: (214) 653-2899
                                                    pharlan@dallascounty.org