IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ANNE HARDING, et al.,                    §
                                         §
                    Plaintiffs,          §
                                         §  Civil Action No. 3:15-CV-0131-D
VS.                                      §
                                         §
COUNTY OF DALLAS, TEXAS,                 §
et al.,                                  §
                                         §
                    Defendants.          §

## MEMORANDUM OPINION

This is a suit by Anglo voters of Dallas County, Texas who maintain that their rights
under § 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301 *et seq.*, and the
Equal Protection Clause of the Fourteenth Amendment have been violated by the absence
of a second county commissioner district that is capable of electing a representative of their
choice: an Anglo Republican. Following a bench trial, and for the reasons explained,[1] the
court holds that plaintiffs have failed to prove that, were a second Anglo majority district
drawn, Anglos would possess the potential to elect an Anglo Republican. In short, this is
because the Anglo citizen voting age population ("CVAP") of Dallas County contains a
significant number of persons (roughly 23%) who vote Democrat. Accordingly, because
plaintiffs cannot prevail on their claims under § 2 of the VRA and the Fourteenth
Amendment Equal Protection Clause, defendants are entitled to judgment dismissing this

_____

[1]The court sets out in this memorandum opinion its findings of fact and conclusions
of law. *See* Fed. R. Civ. P. 52(a)(1).

action with prejudice.

I

Plaintiffs Anne Harding ("Harding"), Gregory R. Jacobs ("Jacobs"), Holly Knight Morse ("Morse"), and Johannes Peter Schroer ("Schroer"), Anglo residents[2] of Dallas County, Texas, bring this suit challenging the 2011 map ("2011 Map") for electing commissioners of the Dallas County Commissioners Court ("Commissioners Court"). Their claims that were tried are under § 2 of the VRA and the Equal Protection Clause of the Fourteenth Amendment, alleging intentional and "effects" vote dilution as a result of the redistricting in 2011 of commissioner districts.

Dallas County is governed by a Commissioners Court comprised of four county commissioners, who are elected from single member districts, and a county judge, who is elected countywide. *See* Tex. Const. art V, § 18(b). Following the 2010 Census, Dallas County Judge Clay Lewis Jenkins ("Judge Jenkins") and then-county commissioners Maurine Dickey ("Commissioner Dickey"), Mike Cantrell ("Commissioner Cantrell"), John Wiley Price ("Commissioner Price"), and Dr. Elba Garcia ("Commissioner Garcia") determined that it was necessary to redraw district lines because the map drawn after the prior census (the "Benchmark Map") had become malapportioned. The Commissioners Court concluded that the Benchmark Map violated the one-person, one-vote requirement of the Equal Protection Clause because Dallas County's population had grown

---

[2]The court uses the term "Anglo" to refer to individuals who are Caucasian, non-Hispanic.

disproportionately in Commissioners Court districts ("CCDs") 3 and 4.

The Commissioners Court retained J. Gerald Hebert, Esquire ("Hebert") and Rolando L. Rios, Esquire ("Rios") as outside redistricting counsel. Hebert, in turn, employed Matt Angle ("Angle"), an expert on North Texas geography and demographics, to assist in drawing and presenting redrawn district maps for consideration. During an executive session, the Commissioners Court reviewed the configuration, demographics, and political performance of the Benchmark Map and shared their various redistricting goals (including, for example, Commissioner Dickey's desire that there be a "conservative," or "Tea Party" district). They directed Hebert and Rios to draft and present specific redistricting criteria for the Commissioners Court to consider, and they directed Angle to configure demonstration plans for their review.

The Commissioners Court unanimously adopted Commissioner Precinct Redistricting Criteria ("Redistricting Criteria") that they determined "would help facilitate public participation and help ensure that any adopted redistricting plans will be consistent with all applicable law." Ps. Tr. Ex. 15 at 1.[3]

---

[3]In order of priority, the Redistricting Criteria are as follows:

> 1. Districts shall be drawn to meet the one-person, one-vote requirements of the United States Constitution. Plans should show the total population and voting age population, according to the official 2010 U.S. Census, for each proposed precinct, including subtotals for African Americans, Hispanics, Asians, Anglos and other population groups.

> 2. Plans should be constructed to comply with all provisions of

Using the Redistricting Criteria, Angle prepared four demonstration maps that he presented to the Commissioners Court during a closed session meeting. After considering the merits of each, the Commissioners decided to present only one map ("Map A"), the

the Voting Rights Act in order to avoid legal liability. Specifically, plans should meet all requirements of Section 5 of the Voting Rights Act prohibiting the retrogression of racial and language minorities and Section 2 of the Voting Rights Act requiring the configuration of Districts that provide racial and language minorities the opportunity to elect their candidate of choice where their populations are sufficiently large and compact.

3. Districts should respect population increases and take into account population decreases in Dallas County over the last decade.

4. To the extent possible, commissioner precincts should be comprised of whole voting precincts (VTDs). Where this is not possible or practical, commissioner precincts should be drawn in a manner that permits the creation of practical voting precincts and that ensures that adequate polling place facilities exist in each voting precinct.

5. Plans should involve the boundaries of all precincts—not just the boundaries of one or several precincts.

6. Where possible, but subsidiary to the equipopulation requirements of the US Constitution and the requirements of the Voting Rights Act, municipal and other significant geographic boundaries should be respected.

7. Where possible, but subsidiary to the equipopulation requirements of the US Constitution and the requirements of the Voting Rights Act, precincts and districts should be geographically compact and composed of contiguous territory.

Ps. Trial Ex. 15 at 2.

predecessor to the map that was ultimately adopted, to the public for consideration. The Commissioners Court then provided notice of, and held a series of, three public hearings related to the redistricting of the CCDs.[4]

During the redistricting process, Commissioner Dickey, a Republican, announced that she would not seek reelection. Before the Commissioners Court voted on Map A, Commissioner Price contacted Angle and asked him to prepare an amendment that, *inter alia*, switched the numbering of CCDs 1 and 2 and adjusted the boundaries between CCDs 1 and 2 in the Oak Lawn area in order to place Commissioner Dickey's home in the renumbered CCD 1. As a result of the exchange in district numbers, it was unnecessary for incumbent Commissioner Cantrell to stand for reelection until 2014 (rather than 2012), and Commissioner Dickey's vacated seat was up for election in 2012.

By a vote of three to one (Commissioner Dickey did not vote), the Commissioners Court adopted the 2011 Map, which Angle had drawn, as the new commissioner districts. The Commissioners Court then submitted the 2011 Map to the U.S. Department of Justice for preclearance under § 5 of the VRA, which was then still in effect.[5] The submission

---

[4]Some of the evidence at trial focused on the conduct of public officials and members of the public at these hearings. Because the court's decision does not turn on this evidence, the court will not recount it.

[5]"Section 5 of the Voting Rights Act require[d] that any change in a 'standard, practice or procedure with respect to voting' by a 'covered jurisdiction' . . . be submitted to the United States Attorney General for prior approval or 'preclearance.'" *E. Jefferson Coal. for Leadership & Dev. v. Parish of Jefferson*, 926 F.2d 487, 490 n.1 (5th Cir. 1991) (quoting 42 U.S.C. § 1973c & 28 C.F.R. § 51.1 *et seq.* (1989)). At the time the 2011 Map was submitted for preclearance, the Supreme Court had not decided *Shelby County, Alabama v.*

stated, *inter alia*:

> The new Commissioner Precinct map maintains two current minority opportunity precincts and creates a new minority opportunity precinct in Precinct 1. Specifically, the new map maintains Precinct 3 as an African American opportunity precinct. The African American population is increased in this precinct from 45.6% to 47.9%. Precinct 4 which is currently represented by a Hispanic, who was the candidate of choice of minority voters in 2010, has not been retrogressed. In fact, the current Precinct 4 is 49.3% Hispanic and 65.5% Black plus Hispanic. The new Precinct 4 is 57.9% Hispanic and 72.1% Black plus Hispanic. Precinct 1 is a new minority opportunity precinct. Precinct 1 has a Hispanic population of 48.0% and is 68.4% Black plus Hispanic.

Ps. Tr. Ex. 16 at 4.

The current composition of the Commissioners Court, elected under the 2011 Map, is as follows: Dr. Theresa Daniel ("Commissioner Daniel") (CCD 1, Democrat); Commissioner Cantrell (CCD 2, Republican); Commissioner Price (CCD 3, Democrat); Commissioner Garcia (CCD 4, Democrat); and Judge Jenkins (Democrat). Two of the four commissioners (Commissioners Cantrell and Daniel) are Anglo, as is Judge Jenkins.

Plaintiffs Harding, Jacobs, Schroer, Ray Huebner ("Huebner"), and Morgan McComb ("McComb")[6] filed this lawsuit against defendants County of Dallas, Texas, Judge Jenkins,

---

*Holder*, 570 U.S. 529 (2013), which invalidated the coverage formula that had been used as a basis for subjecting jurisdictions to preclearance under § 5. *Id.* at 557.

[6]The court granted plaintiffs leave to file a second amended complaint adding Morse as a plaintiff, and it later granted plaintiffs' unopposed motions to withdraw McComb and Huebner as plaintiffs.

and Commissioners Daniel, Cantrell, Price, and Garcia,[7] alleging claims under § 2 of the VRA and under the Equal Protection Clause of the Fourteenth Amendment. In *Harding v. County of Dallas, Texas*, 2018 WL 1157166 (N.D. Tex. Mar. 5, 2018) (Fitzwater, J.) ("*Harding II*"), the court dismissed plaintiffs' racial gerrymandering and alternative equal protection claims. *Id.* at *9-10. The case then proceeded to trial on the two remaining claims.

## II

Before turning to the merits, the court addresses defendants' challenge to plaintiffs' standing.

## A

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). It is well settled that "the issue of standing is one of subject matter jurisdiction." *Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006). The doctrine of standing addresses the question of who may properly bring suit in federal court, and "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). It "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To establish standing, a plaintiff must meet both

---

[7]Judge Jenkins and the county commissioners are sued only in their official capacities.

constitutional and prudential requirements. *See, e.g., Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001).

The only issue in this case is constitutional standing, which requires that a litigant establish three elements: (1) injury-in-fact that is concrete and actual or imminent, not hypothetical; (2) a fairly traceable causal link between the injury and the defendant's actions; and (3) that the injury will likely be redressed by a favorable decision. *E.g., Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009). To obtain injunctive relief, a plaintiff must be "likely to suffer future injury." *City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief[.]" *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974). The threat of future injury to the plaintiff "must be both real and immediate, not conjectural or hypothetical." *Lyons*, 461 U.S. at 102 (internal quotation marks omitted).

### B

Defendants maintain that plaintiffs have failed to offer any evidence that they suffered a cognizable injury—i.e., a particularized harm they experienced on account of their race—that is redressable by their legal claims. They contend that

> [b]ecause the only injury identified by plaintiffs was a desire for more conservative or Republican districts, and because they have not alleged a claim for partisan gerrymandering, plaintiffs have no standing to challenge the [2011 Map] under the VRA or as intentional, racial vote dilution. They have offered no evidence of a particularized, personal injury redressable by their legal claims. And . . . plaintiffs' proposed plan would *reduce* their opportunities to elect their candidates of choice (Republicans), and thus the relief they seek would not redress

their (nonexistent) injuries.

Ds. Post-Trial Br. 9.

Plaintiffs respond that they clearly have standing to bring this action because the 2011 Map dilutes their voting power, intentionally and in effect, denying Anglos representation proportional to their CVAP. Plaintiffs contend that because the 2011 Map packs Anglos into CCD 2 and cracks them across the rest of the county, "[a]s long as the Plaintiffs are a member of that diluted racial group, each may challenge the district in which they live and the entire 'redistricting plan that generated this harm.'" Ps. Br. 9.

C

The court has twice addressed the question of standing in this case, albeit in the context of whether plaintiffs have *pleaded* standing, not whether they have *proved* standing. "The facts necessary to establish standing, however, must not only be alleged at the pleading stage, but also proved at trial." *Gill v. Whitford*, ___ U.S. ___, 138 S.Ct. 1916, 1931 (2018) (citing *Lujan*, 504 U.S. at 561)).

Before trial, the court held that the alleged dilution in plaintiffs' voting strength through the "packing and cracking" of Anglo voters in Dallas County constituted a sufficiently cognizable injury-in-fact to challenge the 2011 Map under the VRA or the Equal Protection Clause of the Fourteenth Amendment. *See Harding II*, 2018 WL 1157166, at *6, 7; *Harding v. Cnty. of Dall., Tex.*, 2015 WL 11121002, at *1 (N.D. Tex. May 28, 2015) (Fitzwater, J.). At trial, plaintiffs proved that the voting power of Anglos residing in CCD 2—including plaintiff Morse—has been "wasted" under the 2011 Map because 42.7% of the

Dallas County Anglo CVAP, according to the 2010 Census, is "packed" into CCD 2, creating an Anglo supermajority (under the 2011 Map, 69.8 % of CCD 2's CVAP is Anglo) that is well beyond the number needed for an Anglo-preferred candidate to be elected. Plaintiffs have also established that the voting strength of Anglos residing on CCDs 1, 3, and 4—including plaintiffs Harding, Jacobs, and Schroer—is diluted because the remaining 57.2 % of the Dallas County Anglo CVAP is "cracked" across the remaining CCDs (21.7 % in CCD 1, 17.3 % in CCD 3, and 18.2 % in CCD 4), spreading the remaining Anglo voters sufficiently thin to prevent them from ever electing their preferred candidates.[8] *See, e.g., Gill*, 138 S.Ct. at 1935 (Kagan, J., concurring). The court therefore finds, for the reasons explained in *Harding II*, 2018 WL 1157166, at *6, that each plaintiff has suffered a legally cognizable injury that is required to prove standing.[9]

---

[8]At trial, plaintiffs presented undisputed evidence that CCD 1's CVAP is 42.8% Anglo; that CCD 3's CVAP is 30.0% Anglo; and that CCD 4's CVAP is 37.6% Anglo.

[9]In her concurring opinion in *Gill*, Justice Kagan explained regarding a partisan gerrymandering claim:

> [t]o have standing to bring a partisan gerrymandering claim based on vote dilution, then, a plaintiff must prove that the value of her own vote has been "contract[ed]." And that entails showing, as the Court holds, that she lives in a district that has been either packed or cracked. For packing and cracking are the ways in which a partisan gerrymander dilutes votes. Consider the perfect form of each variety. When a voter resides in a packed district, her preferred candidate will win no matter what; when a voter lives in a cracked district, her chosen candidate stands no change of prevailing. But either way, such a citizen's vote carries less weight—has less consequence—than it would under a neutrally drawn map. So when she shows that her

Defendants contend that the Supreme Court's recent decision in *Gill* "has direct application" in this case because the Court noted that it "is not responsible for vindicating generalized partisan preferences." Ds. Notice of Supp. Authority 1 (quoting *Gill*, 138 S.Ct. at 1933). The court agrees that *Gill*'s analysis is helpful, although not for the reasons defendants suggest. In *Gill*, a political gerrymandering case, the Court clarified the requirements for proving standing when the plaintiffs' alleged injury is the dilution of their voting strength through the drawing of district lines. Similar to the plaintiffs in this case, the *Gill* plaintiffs alleged that they lived in state assembly districts in which Democrats had been "cracked or packed," resulting in the dilution of their voting strength. But unlike the plaintiffs here, in the *Gill* trial, "not a single plaintiff sought to prove that he or she live[d] in a cracked or packed district." *Id.* at 1932. Instead, the plaintiffs attempted to prove standing based on a "statewide injury to Wisconsin Democrats," *id.*, arguing that "regardless of 'whether they themselves reside in a district that has been packed or cracked,' they have been 'harmed by the manipulation of district boundaries' because Democrats statewide 'do not have the same opportunity provided to Republicans to elect representatives of their choice to the [Wisconsin State] Assembly.'" *Id.* at 1924 (citations omitted). The Court rejected this theory of standing, explaining: "the plaintiffs' partisan gerrymandering claims turn on allegations that their votes have been diluted. That harm arises from the particular

_____

district has been packed or packed, she proves, as she must to establish standing, that she is "among the injured."

*Gill*, 138 S.Ct. at 1936 (Kagan, J., concurring) (citations omitted).

composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Id.* at 1930-31. Because the *Gill* plaintiffs failed to produce district-specific evidence that their individual voting strength had been diluted as a result of the districting plan at issue, the Court held that they had failed to prove an "individual and personal injury of the kind required for Article III standing." *Id.* at 1931.

By contrast, as explained above, the plaintiffs in the instant case have alleged *and proved* that they are Anglos and that each resides in a district where, as a result of alleged "cracking and packing," the voting strength of the Anglo CVAP has been diluted.

D

Defendants also maintain that plaintiffs cannot meet the "redressability" requirement of constitutional standing. They posit that because plaintiffs' "proposed plan would *reduce* their opportunities to elect their candidates of choice (Republicans), . . . the relief they seek would not redress their (nonexistent) injuries." Ds. Post-Trial Br. 9. Defendants' argument, however, goes to the *merits* of plaintiffs' claims rather than to the ability of the court to address plaintiffs' alleged injury. Plaintiffs have established a judicially cognizable injury—that the 2011 Map dilutes the strength of their vote through the cracking and packing of Anglo Dallas County CVAP—that is capable of being redressed by the relief they seek: a declaration that the 2011 Map is unconstitutional and violates the VRA, and an injunction prohibiting defendants from implementing the 2011 Map and requiring defendants or the court to create a replacement map that contains a second Anglo-opportunity CCD. *See, e.g.,*

*Three Expo Events, L.L.C. v. City of Dallas, Tex.*, 182 F.Supp.3d 614, 621 (N.D. Tex. 2016) (Fitzwater, J.) (concluding that redressability element of standing was adequately pleaded at preliminary injunction stage where plaintiff alleged a constitutional injury "that is capable of being redressed by the relief [the plaintiff] seeks.").

Accordingly, the court concludes that plaintiffs have established by a preponderance of the evidence that they have Article III standing to bring their VRA and equal protection claims based on the dilution of their voting power that resulted from the 2011 Map. Although the court concludes below that plaintiffs' vote dilution claims fail on the merits, it nevertheless holds that plaintiffs have sufficiently established an injury-in-fact for standing purposes by pleading a judicially cognizable injury, i.e. vote dilution, and by adducing evidence that the Anglo population has been dispersed unevenly (concentrated in CCD 2 and spread out among the other CCDs) throughout the four CCDs.

But even if the court is in error in holding that plaintiffs have proved Article III standing, the outcome of this case is the same. Regardless whether for lack of standing or for lack of merit, plaintiffs' case must be dismissed.

III

The court now turns to the merits and addresses plaintiffs' vote dilution claim under § 2 of the VRA.

A

"In 1982 Congress substantially revised § 2 of the Voting Rights Act to clarify that a violation requires evidence of discriminatory effects alone, and to make clear that proof of

discriminatory intent is not required to establish a violation of Section 2." *Benavidez v. Irving Indep. Sch. Dist., Tex.*, 690 F.Supp.2d 451, 455 (N.D. Tex. 2010) (Fitzwater, C.J.) (internal quotation marks omitted) (quoting *League of United Latin Am. Citizens # 4434 (LULAC) v. Clements*, 986 F.2d 728, 741 (5th Cir. 1993) ("*LULAC*")).  Section 2(b) now provides that the Act is violated if,

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by [a class of persons of a certain race or color] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301(b).

    In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court first considered the 1982 amended version of § 2, setting out the current framework for analyzing § 2 cases.

> To prevail on a § 2 claim, a plaintiff must first prove that (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single member district," (2) the minority group "is politically cohesive," and (3) "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate."

*Benavidez*, 690 F.Supp.2d at 455 (citations omitted) (quoting *Gingles*, 478 U.S. at 50-51).

"Failure to establish any one of the *Gingles* factors precludes a finding of vote dilution,

because these circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice." *Id.* (internal quotation marks and brackets omitted) (quoting *LULAC*, 986 F.2d at 743). "[The Fifth Circuit] has interpreted the *Gingles* factors as a bright line test." *Id.* at 456 (alteration in original) (quoting *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852 (5th Cir. 1999)). "Each factor must be proved. Failure to establish any one of these threshold requirements is fatal." *Id.* (citations, brackets, and some internal quotation marks omitted) (quoting *Valdespino*, 168 F.3d at 852).

> If a plaintiff meets the threshold *Gingles* test, the court must then engage in a broader "totality of the circumstances" inquiry, considering whether the minority group has demonstrated that "under the totality of the circumstances, 'its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'"

*Id.* at 456 n.7 (quoting *LULAC*, 986 F.2d at 747). "In conducting this broad inquiry, a court must be 'flexible in its totality inquiry and guided by factors drawn from the Senate Judiciary Committee report on the 1982 amendments to the Voting Rights Act and reference *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973).'"[10] *Fabela v. City of Farmers Branch, Tex.*,

---

[10]The factors to be considered when evaluating the totality of the circumstances include:

> [1] the history of voting-related discrimination in the State or political subdivision;
>
> [2] the extent to which voting in the elections of the State or political subdivision is racially polarized;

2012 WL 3135545, at *3 (N.D. Tex. Aug. 2, 2012) (Fitzwater, C.J.) (quoting *Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 292 (5th Cir. 1996)).  This list of factors is not exhaustive, however, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."  *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, at 29 (1982)).  Moreover, "[n]ot every factor will be relevant in every case."  *Veasey*

_____

> [3] the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group[;]
>
> [4] the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;
>
> [5] the use of overt or subtle racial appeals in political campaigns;
>
> [6] the extent to which members of the minority group have been elected to public office in the jurisdiction[;]
>
> [7] evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group[;]
>
> [8] [evidence] that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous[;]
>
> [9] whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area[.]

*Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 672-73 (5th Cir. 2009) (alterations in original) (quoting *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399, 426 (2006) ("*LULAC v. Perry*")).

*v. Abbott*, 830 F.3d 216, 246 (5th Cir. 2016) (en banc). Rather, "the proper assessment of vote dilution claims is 'peculiarly dependent upon the facts of each case' and requires 'an intensely local appraisal of the design and impact of the contested electoral mechanisms.'" *Rodriguez v. Bexar Cnty., Tex.*, 385 F.3d 853, 860 (5th Cir. 2004) (quoting *Gingles*, 478 U.S. at 79). "A plaintiff must prove a § 2 violation by a preponderance of the evidence." *Benavidez*, 690 F.Supp.2d at 456 (citing *League of United Latin Am. Citizens # 4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 846 (5th Cir. 1997)).[11]

B

1

Under the first prong of *Gingles*, plaintiffs must prove that the Anglo population in Dallas County is "sufficiently large and geographically compact to constitute a majority in a single member district." *LULAC*, 986 F.2d at 742. To satisfy this requirement, plaintiffs must establish that there is a potential single member district in which a majority of the CVAP is Anglo. *See id.* at 743; *Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019, 1023 (5th Cir. 2009) (holding that only CVAP is relevant in evaluating first prong of *Gingles*). In *Bartlett v. Strickland*, 556 U.S. 1 (2009) (plurality opinion), the Supreme Court considered the "minimum-size question," concluding that the majority-minority rule "relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age

---

[11]Although the court does not repeat the preponderance of the evidence standard in this memorandum opinion, all of its findings of fact are based upon a preponderance of the evidence.

population in the relevant geographic area?"  *Id*. at 13, 18.  "That rule provides straightforward guidance to courts and to those officials charged with drawing district lines to comply with § 2."  *Id.*  This requirement is essential to demonstrate that "minority voters possess the *potential* to elect representatives[.]"  *Gingles*, 478 U.S. at 50 n.17.

Plaintiffs rely on the expert testimony of Peter Morrison, Ph.D. ("Dr. Morrison")[12] to establish the first prong of *Gingles*.[13]  Using data from the 2010 Census full-count PL94-171 and the 2014 5-year American Community Survey ("ACS"), Dr. Morrison proposes an alternative to the 2011 Map, in which Anglos constitute a majority of the CVAP in two commissioner districts.  Dr. Morrison's map, which he refers to as the "Remedial Plan," distributes Dallas County's CVAP as illustrated in the following table:

---

[12]Dr. Morrison is an applied demographer who previously worked as Senior Demographer and founding director of the RAND Corporation's Population Research Center.

[13]"As is commonly the case in § 2 litigation, [plaintiffs'] claim turns on the expert witnesses' factual testimony."  *Benavidez*, 690 F.Supp.2d at 457 n.9 (quoting the statement in *LULAC*, 986 F.2d at 736, that "[a]s with all cases under the Voting Rights Act, this one is driven by the facts.").

| Remedial Plan (2018 implementation) | | | | | | |
|---|---|---|---|---|---|---|
| District | Total Pop. (2010) | Citizen Voting-age Population 2010-14 | | | | |
| | | Total | White | Black | Hispanic | All other |
| | | *Number* | | | | |
| 1 | 575,706 | 293,040 | 111,218 | 56,038 | 110,249 | 15,535 |
| 2 | 601,102 | 387,620 | 252,720 | 50,447 | 54,635 | 29,818 |
| 3 | 597,941 | 365,420 | 81,808 | 207,452 | 67,392 | 8,768 |
| 4 | 593,390 | 364,095 | 200,635 | 60,659 | 70,128 | 32,673 |
| County Total | 2,368,139 | 1,410,175 | 646,381 | 374,596 | 302,404 | 86,794 |
| *Total deviation from ideal:* 4.29% | | | | | | |
| | | *Share of Total CVAP* | | | | |
| 1 | | 100% | 38.0% | 19.1% | 37.6% | 5.3% |
| 2 | | 100% | 65.2% | 13.0% | 14.1% | 7.7% |
| 3 | | 100% | 22.4% | 56.8% | 18.4% | 2.4% |
| 4 | | 100% | 55.1% | 16.7% | 19.3% | 9.0% |
| County Total | | 100% | 45.8% | 26.6% | 21.4% | 6.2% |
| Sources: 2010 Census, PL94-171 file; 2014 5-year ACS file. | | | | | | |

Ps. Tr. Ex. 68 at 12. Under Dr. Morrison's Remedial Plan, Anglos constitute more than 50% of the CVAP in two of the four commissioner districts (i.e., CCDs 2 and 4 in the Remedial Plan).

Under the second and third prongs of *Gingles*, plaintiffs must prove that Anglo voters are "politically cohesive" and that the non-Anglo majority "votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (citations omitted). "Racially polarized voting, i.e., 'where there is a consistent relationship between [the] race of the voter and the way in which the voter votes,' is relevant to a vote dilution claim." *Fabela*, 2012 WL 3135545, at *8 (alteration in original) (some internal quotation marks omitted) (quoting *Gingles*, 478 U.S. at 53 n.21 & 56). It tends to prove that the "minority group members constitute a politically cohesive unit," under the second *Gingles* prong, and that they are unable to elect representatives of their choice because, under the third *Gingles* prong, the majority group is similarly politically cohesive and votes "sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56; *see also, e.g., Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1207 (5th Cir. 1989) ("Evidence of racially polarized voting 'is the linchpin of a section 2 vote dilution claim' and is relevant to establishing [the second and third elements] . . . in *Gingles* [.]" (citations omitted)). "Because . . . the extent of bloc voting necessary to demonstrate that a minority's ability to elect its preferred representatives is impaired varies according to several factual circumstances, the degree of bloc voting which constitutes the threshold of legal significance will vary from district to district." *Gingles*, 478 U.S. at 55-56.

A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2. And, in general, a [majority] bloc vote that normally will defeat the combined strength of minority support plus [majority] "crossover" votes rises to the level of legally significant [majority] bloc voting. The amount of [majority] bloc voting that can generally "minimize or cancel," [minority] voters' ability to elect representatives of their choice, however, will vary from district to district according to a number of factors, including the nature of the allegedly dilutive electoral mechanism; the presence or absence of other potentially dilutive electoral devices, such as majority vote requirements, designated posts, and prohibitions against bullet voting; the percentage of registered voters in the district who are members of the minority group; the size of the district; and, in multimember districts, the number of seats open and the number of candidates in the field.

*Id.* at 56 (citations omitted).

3

To prove the second and third prongs of *Gingles*, plaintiffs rely on the expert report of M.V. (Trey) Hood III, Ph.D. ("Dr. Hood"). In his report, Dr. Hood analyzes election results from six contested endogenous elections (i.e., county commissioner elections from 2006, 2010, 2012, and 2016) and from three[14] contested exogenous elections (i.e., Dallas County Judge elections from 2006, 2010, and 2014). Based on his analysis, Dr. Hood concludes that, for each of these elections, there was a "clear candidate of choice for Anglo voters," Ps. Tr. Ex. 69 at 16, which he defines to be "present in a race when a majority

---

[14]Because Dr. Hood has analyzed election results from each CCD for the three Dallas County Judge elections he considered, he maintains that he has analyzed 12 exogenous elections.

(>50%) of Anglo voters are shown to support a particular candidate," *id.* at 6 n.8, and that

the Anglo candidate of choice is usually defeated (in 5 of 6 endogenous elections) by a non-

Anglo majority voting bloc.

To estimate the share of each racial/ethnic group voting for a candidate in a specific

contest, Dr. Hood relies on what he considers to be two commonly used statistical techniques

for evaluating § 2 vote dilution claims: Ecological Regression ("ER") and Ecological

Inference ("EI"). Dr. Hood's findings with respect to the commissioner elections he

considered are summarized in the following tables:

| 2006 County Commissioners Court Election, District 4 | | | | |
|---|---|---|---|---|
| Candidate | Anglo | Black | Hispanic | Other |
| Mayfield* (Republican) | 76.6% (ER) 75.6% (EI) | 0% (ER) 1.9% (EI) | 20.6% (ER) 19.0% (EI) | 66.8% (ER) 61.1% (EI) |
| Renfroe (Democrat) | 23.4% (ER) 24.4% (EI) | 100% (ER) 98.1% (EI) | 79.4% (ER) 81.0% (EI) | 33.2% (ER) 38.9% (EI) |
| *Mayfield won this election. | | | | |

| 2010 County Commissioners Court Election, District 4 | | | | |
|---|---|---|---|---|
| Candidate | Anglo | Black | Hispanic | Other |
| Mayfield (Republican) | 92.2% (ER) 93.5% (EI) | 0% (ER) 0.3% (EI) | 23.7% (ER) 20.4% (EI) | 46.1% (ER) 38.9% (EI) |
| Garcia* (Democrat) | 4.5% (ER) 3.6% (EI) | 100% (ER) 98.7% (EI) | 72.9% (ER) 75.6% (EI) | 50.1% (ER) 52.9% (EI) |
| Miles (Libertarian) | 3.4% (ER) 2.9% (EI) | 0.3% (ER) 1.0% (EI) | 3.4% (ER) 4.0% (EI) | 3.8% (ER) 8.2% (EI) |
| *Garcia won this election. | | | | |

| 2012 County Commissioners Court Election, District 1 | | | | |
|---|---|---|---|---|
| Candidate | Anglo | Black | Hispanic | Other |
| Miller (Republican) | 69.9% (ER) 70.8% (EI) | 0% (ER) 0.8% (EI) | 25.2% (ER) 17.9% (EI) | 51.5% (ER) 47.6% (EI) |
| Daniel* (Democrat) | 30.1% (ER) 29.2% (EI) | 100% (ER) 99.2% (EI) | 74.8% (ER) 82.1% (EI) | 48.5% (ER) 52.4% (EI) |
| *Daniel won this election. | | | | |

| 2012 County Commissioners Court Election, District 3 | | | | |
|---|---|---|---|---|
| Candidate | Anglo | Black | Hispanic | Other |
| Lingerfelt (Republican) | 85.0% (ER) 81.1% (EI) | 0% (ER) 0.4% (EI) | 22.2% (ER) 22.4% (EI) | 88.8% (ER) 59.3% (EI) |
| Price* (Democrat) | 15.0% (ER) 18.9% (EI) | 100% (ER) 99.6% (EI) | 77.8% (ER) 77.6% (EI) | 11.2% (ER) 40.7% (EI) |
| *Price won this election. | | | | |

| 2016 County Commissioners Court Election, District 1 | | | | |
|---|---|---|---|---|
| Candidate | Anglo | Black | Hispanic | Other |
| Rayshell (Republican) | 63.0% (ER) 62.0% (EI) | 0% (ER) 1.4% (EI) | 21.5% (ER) 21.1% (EI) | 39.1% (ER) 44.4% (EI) |
| Daniel* (Democrat) | 37.0% (ER) 38.0% (EI) | 100% (ER) 98.6% (EI) | 78.5% (ER) 78.9% (EI) | 60.9% (ER) 55.6% (EI) |
| *Daniel won this election. | | | | |

| 2016 County Commissioners Court Election, District 3 | | | | |
|---|---|---|---|---|
| Candidate | Anglo | Black | Hispanic | Other |
| Russell (Republican) | 72.5% (ER) 77.6% (EI) | 0.0% (ER) 0.2% (EI) | 18.4% (ER) 13.3% (EI) | 100% (ER) 53.4% (EI) |
| Price* (Democrat) | 19.0% (ER) 14.9% (EI) | 99.7% (ER) 98.8% (EI) | 73.8% (ER) 76.5% (EI) | 4.1% (ER) 36.1% (EI) |
| Hendricks (Libertarian) | 8.5% (ER) 7.5% (EI) | 2.8% (ER) 1.0% (EI) | 7.9% (ER) 10.2% (EI) | 0.0% (ER) 10.5% (EI) |
| *Price won this election. | | | | |

*See* Ps. Tr. Ex. 69 at 7-10.

Dr. Hood also analyzed the "exogenous, but closely related" County Judge elections from 2006, 2010, and 2014, offering evidence that Anglo support for the Republican candidate in these three elections ranged from 60.9% to 94.4%, with a mean of 72.98%.

## C

### 1

The purpose of the *Gingles* analysis is to "establish that 'the minority [group] *has the potential to elect a representative of its own choice*' in a possible district, but that racially polarized voting prevents it from doing so in the district as actually drawn because it is 'submerg[ed] in a larger [majority race] voting population.'" *Cooper v. Harris*, ___ U.S. ___, 137 S. Ct. 1455, 1470 (2017) (emphasis and some alterations added) (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)). Conversely, where the minority group is either too small or insufficiently compact or cohesive to have any real opportunity to elect a candidate of its

choice in a possible district, there has been no violation of § 2.

> The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.

*Gingles*, 478 U.S. at 50 n.17.

> Under *Gingles*, the ultimate question is whether a districting decision dilutes the votes of minority voters, and it is hard to see how this standard could be met if the alternative to the districting decision at issue would not enhance the ability of minority voters to elect the candidates of their choice.

*Abbott v. Perez*, ___ U.S. ___, 138 S.Ct. 2305, 2332 (2018); *see id.* ("So if Texas could *not* create two performing districts in Nueces County . . . the logical result is that Texas did not dilute the Latino vote."); *see also, e.g., Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 480 (1997) ("Because the very concept of vote dilution implies—and, indeed, necessitates—the existence of an 'undiluted' practice against which the fact of dilution may be measured, a § 2 plaintiff must also postulate a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." (citing *Holder v. Hall*, 512 U.S. 874, 881 (1994))).

In the present case, even if the court assumes that plaintiffs have satisfied each of the three *Gingles* prongs,[15] the court still finds that they have failed to prove the "ultimate

---

[15]Defendants dispute that plaintiffs have met their burden to establish the first prong of *Gingles*. They maintain that, although it is mathematically possible to draw an additional majority-minority CVAP district, the first prong of *Gingles* "ultimately focuses on whether such a district would 'elect candidates of [the minority group's] choice,'" Ds. Post-Trial Br.

question" of vote dilution under § 2 because they have not proved that the minority group (i.e., Anglos) "has the potential to elect a [Republican]," which plaintiffs maintain would be the Anglo candidate of choice, in a possible second commissioner district. *See Cooper*, 137 S.Ct. at 1470. In fact, for the reasons explained below, the evidence as a whole demonstrates just the opposite.

2

In their Remedial Plan, plaintiffs propose a map in which Anglos constitute a majority (65.2% and 55.1%) in two districts (Remedial Plan districts 2 and 4, respectively). In

---

at 10 (alteration in original) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994)), and plaintiffs have failed to show that their proposed Anglo majority districts will functionally perform to give Anglo voters an opportunity to elect their candidates of choice. Although defendants' argument makes sense, the court has not found any authority for the proposition that plaintiffs must prove that their proposed map will perform for the minority group in order to meet the *first* prong of *Gingles*. In *De Grandy*, on which defendants rely, the Supreme Court stated that "[w]hen applied to a claim that single-member districts dilute minority votes, the first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population *to elect candidates of its choice*." *De Grandy*, 512 U.S. at 1008 (emphasis added). But in that case, the Court performed no analysis under the first prong of *Gingles*: it "assum[ed] without deciding that even if Hispanics are not an absolute majority of the relevant population in the additional districts, the first *Gingles* condition has been satisfied." *Id.* at 1009. Defendants also quote language from *LULAC v. Perry*, 548 U.S. at 428, in which the Court stated that "it may be possible for a citizen voting-age majority to lack real electoral opportunity." *Id.* But in *LULAC v. Perry* the Court did not require plaintiffs to demonstrate that they would have been able to elect their candidate of choice under their proposed district (i.e., the district that existed before the State redistricted). In fact, the Court explicitly stated, in the context of its analysis of the first prong of *Gingles*, that "[t]he circumstance that a group does not win elections does not resolve the issue of vote dilution. We have said that 'the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race.'" *LULAC v. Perry*, 548 U.S. at 428 (quoting *De Grandy*, 512 U.S. at 1014 n.11).

creating these two Anglo opportunity districts, however, plaintiffs have failed to account for the undisputed facts that roughly 23% of Dallas County's Anglo population votes for Democrat candidates and that a large portion of these Anglo Democrats reside in Remedial Plan districts 2 and 4.

Defendants' expert, Angle, concludes in his October 13, 2017 Report ("Rebuttal Report")[16] that plaintiffs cannot show that the two Anglo majority districts they propose (i.e. Remedial Plan districts 2 and 4[17]) will provide a legitimate opportunity to elect two Republicans. This is because although Remedial Plan districts 2 and 4 have a majority Anglo CVAP, the configurations of the districts include neighborhoods that are not reliably Republican, with both Anglo and minority voting populations that may support minority-preferred Democrat candidates.

Angle begins with Remedial Plan district 2, explaining that rather than extending east along the northern boundary of Dallas County, taking in reliably Republican neighborhoods before moving south to pick up north Dallas and the Park Cities, Remedial Plan district 2 includes the Democrat neighborhoods around Love Field, south Richardson, Hamilton Park,

---

[16]Angle also submitted a supplemental report dated March 16, 2018, which plaintiffs have moved to strike on the ground that it does not constitute "supplementation" but is, instead, an untimely disclosure that should be stricken under Fed. R. Civ. P. 37(c)(1). The court deferred a ruling on the motion to strike and now denies it as moot because the court has not considered Angle's March 16, 2018 supplemental report in deciding this case.

[17]In Angle's Rebuttal Report, the district numbering used on the Remedial Plan differs from the numbering Dr. Morrison uses in his expert report. For purposes of this memorandum opinion, the court uses the Remedial Plan district numbering found on page 13 of Dr. Morrison's expert report, Ps. Tr. Ex. 68.

and Oak Lawn. The proposed district removes approximately 219,258 persons from current CCD 2, 46.5% of whom supported Democrat candidate Hillary Clinton ("Secretary Clinton") for President in the 2016 General Election, and 43.9% of whom supported Democrat candidate Lupe Valdez ("Sheriff Valdez") for Sheriff in the 2016 General Election. And it adds approximately 260,209 persons who were not included in current CCD 1, 67.7% of whom supported Secretary Clinton in the 2016 General Election and 63.3% of whom supported Sheriff Valdez in the 2016 General Election.

Plaintiffs' other proposed Anglo district, Remedial Plan district 4, begins in the relatively strong Republican area of north Richardson, but extends south to include nearly all of the marginally Democrat suburb of Mesquite, west to include the strongly Democrat city of Balch Springs, and westward to I-45, picking up parts of the Democrat suburbs of Wilmer and Hutchins. In configuring Remedial Plan district 4, plaintiffs have removed approximately 354,831 persons from current CCD 2. Of the removed population, 49.2% supported Secretary Clinton in the 2016 General Election, and 44.1% supported Sheriff Valdez. Of the approximately 373,782 persons added to Remedial Plan district 4, 57.7% supported Secretary Clinton and 57.4% supported Sheriff Valdez in the 2016 General Election.

In sum, Angle persuasively explains that districts 2 and 4 in the Remedial Plan split the neighborhoods in the northern part of Dallas county that most reliably support Republicans and add to each district neighborhoods with growing minority populations and growing Democrat strength.

Angle opines that, had the Remedial Plan been adopted by the Commissioners Court in 2011, it is likely that Democrat party leaders would have targeted all four districts, and it is possible that all four commissioner districts might now be represented by Democrats. To support this prediction, Angle compares election results from the 2016 General Election[18] to the Remedial Plan, demonstrating that, although the Anglo candidate of choice (i.e., the Republican candidate) carried CCD 2 in the 2016 General Election under the 2011 Map, Democrat candidates Secretary Clinton and Sheriff Valdez would have carried all four commissioner districts under the Remedial Plan.

| 2011 Map (Current Commissioners Court) | | | | |
|---|---|---|---|---|
| District | Sheriff Democrat | Sheriff Republican | President Democrat | President Republican |
| 1 | 66.4% | 33.6% | 65.4% | 30.3% |
| 2 | 44.1% | 55.9% | 45.9% | 49.2% |
| 3 | 75.4% | 24.6% | 73.9% | 23.4% |
| 4 | 68.1% | 31.9% | 66.0% | 30.1% |

---

[18]At trial, plaintiffs objected to defendants' use of data from the 2016 General Election. They contended, *inter alia*, that they did not have time to have their experts analyze these data so that they could provide more than a "common sense rebuttal" to this court. Closing Argument Tr. 24. Angle's Rebuttal Report, however, which contains his predictions using the 2016 General Election data, is dated October 13, 2017, well before the date the trial commenced.

| Remedial Plan[19] | | | | |
|---|---|---|---|---|
| District | Sheriff Democrat | Sheriff Republican | President Democrat | President Republican |
| 1 | 66.3% | 33.7% | 64.0% | 32.1% |
| 2 | 50.6 | 49.4 | 52.8% | 42.2% |
| 3 | 83.1 | 16.9 | 81.7% | 15.6% |
| 4 | 50.8% | 49.2% | 49.8% | 46.0% |

Defendants' political science expert, Matthew Barreto, Ph.D., similarly opines that plaintiffs' proposed Remedial Plan would lead to a *decrease* in the opportunities for Anglo Republican voters, explaining in his October 13, 2017 Rebuttal Report:

> [u]nder the current districting plan, Anglo voters have shown the ability to elect candidates of choice in district 2, including Commissioner Mike Cantrell. However, the changes to district 2 proposed by Morrison represent a clear retrogression, creating a district that Anglos would be in jeopardy of losing and, as importantly, failing to protect the incumbent, a traditional redistricting principle historically allowed by the courts and followed by Dallas County. For example, under the current district boundaries, Republican Donald Trump carried District 2 in 2016 49.2% to 45.9% over Democrat Hillary Clinton. However, under the districting plan proposed by Morrison[,] Trump would have lost the district to Clinton (46.4% for Trump and 49.4% for Clinton). This change from winning the district by 3 points, to losing the district by 3 points is a clear retrogression to Anglo voting strength in District 2 (Cantrell). In the 2016 County Judge race, Natinsky won 60.2% of the votes. However, under the new redistricting proposal submitted by Morrison the percent for the Anglo-preferred Natinsky drops

---

[19]The court has used the figures from Angle's chart, but has adjusted the district numbering to match the numbering used in Dr. Morrison's report.

to 55.7%, more evidence of retrogression.

Ds. Tr. Ex. 63 at 11-12.

Defendants posit that plaintiffs have unsuccessfully tried to craft their Remedial Plan using the approximately 23% of Anglos who historically support Democrats along with the remainder who support Republicans to meet a bare 50% Anglo CVAP threshold in two districts. Defendants argue, and the court agrees, that the only evidence the court has before it shows that doing this results in two districts that will likely perform for Democrats. Simply put, although there may be a sufficient number of Anglos residing in Dallas County to draw two districts with Anglo CVAP majorities, because approximately 23% of Anglos in the county typically support Democrats, and because all Anglos are not concentrated in one area of the County, dividing up the Anglo population that is concentrated in north Dallas County between two districts in an area where Democrat-leaning African American and Hispanic voters also live results in two districts that are likely to elect Democrats.

3

Plaintiffs contend that they do not have to prove "functionality" in order to prevail on their § 2 claim, but, instead, they only have to show that an alternate map could be drawn that "guarantees the right of equal access without dilution." Closing Arguments Tr. 27. They cite *Johnson v. De Grandy*, 512 U.S. 997 (1994), and Fifth Circuit authority for the proposition that they "need not show that Anglos will ultimately succeed at the polls if their demonstrative map (or one like it) were enacted," and that "[t]he goal of § 2 is to guarantee minorities an equal *opportunity*, through a fair electoral process." Ps. Post-Trial Br. 28-29;

*see id.* at 29 (arguing that "§ 2 protects only that opportunity, 'not the right to vote for the winning candidate.'" (quoting *Nevett v. Sides*, 571 F.2d 209, 236 (5th Cir. 1978))). The court does not disagree with plaintiffs' position that § 2 does not require them to *guarantee* that an Anglo candidate of choice would prevail under their Remedial Plan. In fact, the Supreme Court has expressly stated that "the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *De Grandy*, 512 U.S. at 1014 n.11; *see also League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399, 428 (2006) ("*LULAC v. Perry*") (same). But § 2 does require that plaintiffs prove that district lines can be drawn in a way that gives them an equal *opportunity* to elect their candidate of choice. *See Gingles*, 478 U.S. at 47 ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the *opportunities* enjoyed by black and white voters to elect their preferred representatives."); *see also Rodriguez v. Harris Cnty., Tex.*, 964 F.Supp.2d 686, 698 (S.D. Tex. 2013) ("Ultimately, the right to undiluted voting strength, provided by Section 2, is a guarantee of equal opportunity in voting, ensuring that a minority group is not denied, on account of race, color, or language minority status, the opportunity to exercise an electoral power that is commensurate with its population in the relevant jurisdiction." (citations omitted)). Plaintiffs have failed to make this showing because their candidate of choice is a Republican, and there are not a sufficient number of Anglo Republicans to elect a Republican candidate in more than one commissioner district.

Plaintiffs contend that they have demonstrated that it was possible for Dallas County to have adopted a map that would have respected plaintiffs' rights under § 2. They maintain that their expert, Dr. Hood, provided "irrefutable evidence that Anglos in Dallas County are politically cohesive *at the County Commissioner Court level* of government, always voting as a bloc." Ps. Post-Trial Br. 29. They criticize defendants for relying on exogenous election data (i.e., the 2016 General Election) to show that creating a second Anglo opportunity district would not give Dallas County Anglos an opportunity to elect a second Republican to the Commissioners Court if the district lines were redrawn. Plaintiffs maintain that regardless whether Secretary Clinton would have carried a redrawn district in the 2016 General Election, this "has nothing to do with the Commissioners Court level of government," and that "[i]t is possible for somebody at one level of government to win from one political party but in that same area for a person to be represented by a member of a different political party at another level of government." Closing Arguments Tr. 24.

The results of Dr. Hood's analysis are set out above. *See supra* § III(B)(3). They show that, under the 2011 Map, in CCDs 3 and 4, Anglo voters' support for Republican candidates in the endogenous Commissioners Court elections has ranged from roughly 72.5% to 92.2%, with a mean of 83.65%, and Anglo voters' support for Democrat candidates has ranged from 3.6% to 19%, with a mean of 12.7%. With respect to CCD 1, however, Anglo support for Republican candidates has been significantly lower, ranging from 62% to 70.8%, with a mean of 66.4%; Anglo support for Democrat candidates has ranged from 29.2% to

30.8%, with a mean of 33.6%. Plaintiffs rely on these election results to demonstrate Anglo cohesiveness. And perhaps they do show that Anglos as a whole (or at least Anglos in CCDs 3 and 4) *do* vote cohesively. But the election results on which Dr. Hood relies fail to take into account the geographical dispersion of Anglo Democrats and the high concentration of these types of voters in the neighborhoods plaintiffs would include in their proposed "Anglo opportunity" districts. If the Anglos whom plaintiffs are using to create majorities in their proposed "Anglo opportunity" districts (districts 2 and 4 in Dr. Morrison's Remedial Plan) are the 12.7% of Anglos residing in CCDs 3 and 4 who prefer Democrat Commissioners Court candidates and the 33.6% of Anglos residing in CCD 1 who prefer Democrat candidates, and if the Republican Anglos are split between two districts, each of which also includes African American and Hispanic populations who reliably vote for Democrat candidates, the "Anglo opportunity" districts plaintiffs have created in their Remedial Plan will not, in fact, provide Republican Anglos with any meaningful opportunity to elect Republicans to the Commissioners Court. Indeed, as discussed above, defendants' evidence proves this.

To the extent plaintiffs criticize defendants' reliance on data from the 2016 General Election, the court agrees that endogenous election results would have been more persuasive in assessing the functionality of plaintiffs' Remedial Plan than results from the 2016 General Election. *See, e.g., Rodriguez*, 964 F.Supp.2d at 759 ("Endogenous elections, or contests within the jurisdiction and for the particular office that is at issue, are more probative than exogenous elections."). Exogenous election results, however, are not irrelevant. *See, e.g.,*

*id.* ("Nevertheless, exogenous elections—*i.e.* elections in a district for positions that are not exclusively representative of that district—are probative on the question of vote dilution and should be considered by the district court." (citations omitted).  Regardless, plaintiffs did not offer *any* evidence at trial that would show how Republican candidates would fare in commissioner elections under their Remedial Plan.  In fact, plaintiffs offered no evidence or analysis of *any* election using their proposed Remedial Plan.  Dr. Morrison testified that he had no opinion as to whether Anglo voters would have the opportunity to elect their candidates of choice under the Remedial Plan, *see* Trial Tr. 2:116-17, and plaintiffs' political science expert, Dr. Hood, did not perform this analysis either, *see* Trial Tr. 3:37, 42.

It is plaintiffs' burden to prove that the 2011 Map violates § 2 of the VRA.  *See Benavidez*, 690 F.Supp.2d at 456.  Plaintiffs have not presented evidence regarding the "functionality" of their proposed Remedial Plan, and have failed to prove that it is even possible to create two commissioner districts in which Dallas County Anglos would have an opportunity to elect a Republican (which plaintiffs maintain is the Anglo candidate of choice).

## D

In sum, to prevail on their § 2 vote dilution claim, plaintiffs must "establish that 'the minority [group] *has the potential to elect a representative of its own choice*' in a possible district, but that racially polarized voting prevents it from doing so in the district as actually drawn.'"  *Cooper* 137 S. Ct. at 1470 (emphasis added) (quoting *Growe*, 507 U.S. at 40).  Plaintiffs have failed to meet their burden to show that the CCDs in Dallas County could be

redrawn to create a second district in which Anglo voters have the potential to elect a Republican candidate to the Commissioners Court. As the Supreme Court stated in *Gingles*, the analysis of a § 2 vote dilution claim "is peculiarly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms." *Gingles*, 478 U.S. at 79 (internal quotation marks and citations omitted). Here, based on the evidence presented at trial, the court finds that plaintiffs have not shown, given the political makeup of the Dallas County Anglo CVAP and the geographical distribution of Dallas County Anglo Republicans, that they have the potential to elect a Republican in a second commissioner district. In other words, because plaintiffs have failed to produce any evidence at trial that the Commissioners Court could have created two performing districts for Anglo Republicans, "the logical result is that [defendants] did not dilute the [Anglo Republican] vote." *Abbott*, 138 S.Ct. 2332. In fact, if anything, the evidence shows that plaintiffs' voting power has been *strengthened*, rather than diluted, by the concentration of Anglos in CCD 2 where they can reliably elect a Republican candidate. Accordingly, the court finds that plaintiffs have not proved their § 2 vote dilution claim.

IV

The court now turns to plaintiffs' equal protection claim, which is based on the allegation that the Commissioners Court intentionally designed the 2011 Map to reduce and lessen Dallas Anglos' electoral opportunities significantly below the level of opportunities that would have been available under a map compliant with neutral principles, and that "[t]he [2011] Map was intentionally crafted to allow Dallas's ethnic majority coalition to dominate

the Commissioners Court beyond what their voting power and geographic distribution would otherwise suggest and to deny Dallas's Anglos the chance to meaningfully participate in the choice of any commissioner outside of CCD 2." 2d Am. Compl. ¶ 31.

To obtain relief on a vote dilution claim under the Fourteenth Amendment, plaintiffs must "prove that the purpose *and operative effect*" of the challenged election scheme "is to dilute the voting strength of [minority] citizens." *Voter Info. Project, Inc. v. City of Baton Rouge*, 612 F.2d 208, 212 (5th Cir. 1980) (emphasis added); *see also Davis v. Bandemer*, 478 U.S. 109, 127 (1986) (plurality opinion) (stating that a plaintiff alleging a violation of the Equal Protection Clause of the Fourteenth Amendment must "prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group"). In other words, while § 2 requires only that the plaintiff prove that a particular voting practice resulted in a discriminatory effect, the Equal Protection Clause requires proof of "both intentional discrimination . . . and an actual discriminatory effect," *Davis*, 498 U.S. at 127.

To prove discriminatory effect, a plaintiff must establish that the election scheme impermissibly dilutes the voting rights of the racial minority. *Rodriguez*, 964 F.Supp.2d at 801. Generally, this requires proof that the racial minority's voting potential has been minimized or canceled out or the political strength of such a group has been adversely affected. *Id*. (citing *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 66 (1980)). Several courts that have addressed the issue have held that a "the identification of a reasonable benchmark against which to measure the challenged voting practice is necessary to show the requisite

discriminatory effect for . . . Equal Protection voting claims, just as it is for § 2 claims."
*Lopez v. City of Houston*, 2009 WL 1456487, at *18 (S.D. Tex. May 22, 2009); *see also Rodriguez*, 964 F.Supp.2d at 801 ("Plaintiffs alleging vote dilution [under the Fourteenth Amendment] must offer 'a reasonable alternative voting practice to serve as the benchmark "undiluted" voting practice.'" (quoting *Reno*, 510 U.S. at 480)); *see also, e.g., Gingles*, 478 U.S. at 50 n.17 ("Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.").

Although the court does not suggest that a plaintiff who is unable to prove a § 2 vote dilution claim can *never* prevail on a Fourteenth Amendment equal protection claim,[20] it holds that given plaintiffs' failure in this case to prove that the 2011 Map actually diluted their voting strength, their equal protection claim must fail.

---

[20]The Eleventh Circuit has indicated in *dicta* that it is unlikely that a plaintiff who is unable to prove a § 2 violation can prevail on a constitutional claim challenging the same allegedly dilutive voting practice. *See, e.g., Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1344-45 (11th Cir. 2000) ("[W]e question, as a legal proposition, whether vote dilution can be established under the Constitution when the pertinent record has not proved vote dilution under the more permissive section 2."); *NAACP v. City of Opelika*, 748 F.2d 1473, 1478 n.7 (11th Cir. 1984) ("[I]f the plaintiffs cannot prevail under the generally more easily proved 'results' standard of section 2, it is unlikely that they could prevail on their constitutional claims in any event."). A member of this court has also noted that "[i]t is unclear whether a plaintiff challenging an electoral system . . . can establish a constitutional vote dilution claim where a Section 2 VRA claim has failed." *Reyes v. City of Farmers Branch, Tex.*, 2008 WL 4791498, at *19 (N.D. Tex. Nov. 4, 2008) (O'Connor, J.), *aff'd*, 586 F.3d 1019 (5th Cir. 2009).

* * *

Accordingly, for the reasons explained, the court holds that plaintiffs have failed to prove their vote dilution claims under § 2 of the VRA and under the Equal Protection Clause of the Fourteenth Amendment, and, by separate judgment entered today, it dismisses this action with prejudice.

August 23, 2018.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE